# 21-2518(L)

### 21-2557 (XAP)

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

---

UPSTATE JOBS PARTY, MARTIN BABINEC, JOHN BULLIS,

*Plaintiffs–Appellees–Cross-Appellants,*

v.

PETER S. KOSINSKI, New York State Board of Elections Co-Chair Commissioner, in his official capacity, DOUGLAS A. KELLNER, New York State Board of Elections Co-Chair Commissioner, in his official capacity, ANDREW J. SPANO, New York State Board of Elections Commissioner, in his official capacity, GREGORY P. PETERSON, New York State Board of Elections Commissioner, in his official capacity,

*Defendants–Appellants–Cross-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

### PAGE PROOF OPENING AND RESPONSE
### BRIEF OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

---

Shawn Toomey Sheehy
Edward Wenger
Phillip Michael Gordon
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: 540-341-8808
Fax: 540-341-8809
ssheehy@holtzmanvogel.com
ewenger@holtzmanvogel.com
pgordon@holtzmanvogel.com

Michael Burger
SANTIAGO BURGER LLP
*Attorneys for Plaintiffs* 2280
East Avenue Rochester, NY
14610
O: (585) 563-2400
F: (585) 563-7526
M: (585) 478-6576
mike@litgrp.com

*Counsel to Plaintiffs-Appellees/Cross-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Rule 26.1 of the Local Rules of the United States Court of Appeals for the Second Circuit, Upstate Jobs Party, Martin Babinec, and John Bullis, disclose the following corporate interests:

1.      The Upstate Jobs Party is a non-profit tax-exempt entity headquartered in Little Falls, New York. It is not a parent company of any corporation nor does it have a parent company.

2.      Martin Babinec is an individual and is not a parent company of any corporation.

3.      John Bullis is an individual and is not a parent company of any corporation.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................v

INTRODUCTION ...........................................................................1

STATEMENT OF SUBJECT-MATTER JURISDICTION.......................................3

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE...............................................................6

    I.    NEW YORK'S ASYMMETRICAL TREATMENT OF MAJOR POLITICAL PARTIES AND INDEPENDENT BODIES ......................6

    II.   UPSTATE JOBS PARTY WAS CREATED TO FIND BIPARTISAN SOLUTIONS TO THE LABOR-RELATED PROBLEMS PLAGUING UPSTATE NEW YORK. .............................9

    III.  UPSTATE JOBS PARTY SUES TO COMPETE ON EQUAL TERMS WITH MAJOR POLITICAL PARTIES...................................13

    IV.  THE DISTRICT COURT LARGELY SIDES WITH UPSTATE JOBS PARTY........................................................15

        A.    The District Court Strikes the Asymmetrical Campaign-Contribution Limits. ......................................16

        B.    The District Court Declines to Find That the Housekeeping-Account Prohibition Violates the U.S. Constitution.......................18

SUMMARY OF THE ARGUMENT ....................................................20

STANDARD OF REVIEW ...................................................................24

ARGUMENT ON APPEAL ...................................................................24

I.    THE LEVELS OF SCRUTINY THAT GOVERN THIS CASE. ..........25

      A.    Plaintiffs Bring an As-Applied Challenge. .....................................25

      B.    The First Amendment Compels Courts to Apply "Rigorous"
            Scrutiny to Laws Affecting Political Contributions.......................26

      C.    New York's Asymmetrical Contribution Limits Violate the
            Equal Protection Clause. ...............................................................29

      D.    Independent Bodies are Similarly Situated With Parties
            Because They are Both Seeking Votes for Their Candidates.........31

II.   NEW YORK'S ASYMMETRICAL CONTRIBUTION LIMITS
      VIOLATE THE FIRST AMENDMENT. ...............................................33

      A.    The Supreme Court Forbids the Imposition of Different
            Contribution Limits for Different Competitors in the Same
            Election..........................................................................................34

      B.    New York's Asymmetrical Contribution Regime Cannot
            Survive First or Fourteenth Amendment Scrutiny.........................36

      C.    New York's Counterarguments are Meritless.................................52

      D.    New York's Unequal Contribution Limit Imposed on Mr.
            Babinec Violates The First And Fourteenth Amendments.............55

ARGUMENT OF CROSS-APPEAL.......................................................61

I.    NEW YORK'S BAN ON HOUSEKEEPING ACCOUNTS FOR
      INDEPENDENT BODIES VIOLATES THE FIRST AND
      FOURTEENTH AMENDMENTS.. .....................................................62

      A.    The Housekeeping-Account Prohibition does not Target
            Actual or Apparent *Quid pro quo* Corruption..............................63

B. The Commissioners Adduced no Evidence That Independent Bodies Pose a Risk of Actual Corruption if They are Allowed to Establish Housekeeping Accounts. .............................65

C. New York Adduced no Evidence That Independent Bodies Pose a Risk of Apparent Corruption if They are Allowed to Establish Housekeeping Accounts. .................................................67

D. Flatly Banning Independent Bodies From Establishing Housekeeping Accounts is not Narrowly Tailored. ........................67

II. THE DISTRICT COURT'S DENIAL OF PLAINTIFFS' HOUSEKEEPING ACCOUNT SUMMARY-JUDGMENT ARGUMENT WAS WRONG AS A MATTER OF LAW. ..................69

CONCLUSION ........................................................................................73

# TABLE OF AUTHORITIES

## CASES

*Austin v. Mich. State Chamber of Commerce*,
494 U.S. 652 (1990)..................................................................29

*Bose Corp. v. Consumers Union*,
466 U.S. 485 (1984)..................................................................24

*Buckley v. Valeo*,
424 U.S. 1 (1976)................................................................*passim*

*Burdick v. Takushi*,
504 U.S. 428 (1992)..................................................................54

*Cal. Medical Ass'n v. FEC*,
453 U.S. 182 (1981)..................................................................64

*Church of Lukumi Babalu Aye v. City of Hialeah*,
508 U.S. 520 (1993)..................................................................43

*Citizens United v. FEC*,
558 U.S. 310 (2010)............................................................*passim*

*Clingman v. Beaver*,
544 U.S. 581 (2005)..............................................................53, 54

*Colo. Republican Fed. Campaign Comm. v. FEC,*
518 U.S. 604, 618 (1996)........................................................37, 39

*Dallman v. Ritter*,
225 P.3d 610 (Colo. 2010)..........................................................30

*Davis v. FEC*,
554 U.S. 724 (2008)............................................................*passim*

*FEC v. Beaumont*,
539 U.S. 146 (2003)..............................................................39, 66

*Frontiero v. Richardson*,
411 U.S. 677 (1973)........................................................................32

*Green Party of Conn. v. Garfield*,
616 F.3d 189 (2d Cir. 2010) .....................................................*passim*

*Hankard v. Town of Avon*,
126 F.3d 418 (2d Cir. 1997) ...........................................................24

*Ill. State Bd. of Elections v. Socialist Workers Party*,
440 U.S. 173 (1979)..........................................................................2

*Iowa Right to Life Comm., Inc. v. Tooker*,
717 F.3d 576 (8th Cir. 2013) .........................................................30

*Kusper v. Pontikes*,
414 U.S. 51 (1973)..........................................................................32

*Lerman v. Board of Elections*,
232 F.3d 135 (2d. Cir. 2000) .....................................................7, 48

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001).........................................................................38

*McConnell v. FEC*,
540 U.S. 93 (2003).....................................................................*passim*

*McCutcheon v. FEC*,
572 U.S. 185 (2014)...................................................................*passim*

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
692 F.3d 864 (8th Cir. 2012) .........................................................29

*Nixon v. Shrink Mo. Gov't Pac*,
528 U.S. 377, 391 (2000)............................................................38, 46

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) .........................................24, 64, 70, 71

*Ognibene v. Parkes,*
    671 F.3d 174 (2d Cir. 2011) ....................................................*passim*

*Panzella v. Sposato,*
    863 F.3d 210 (2d Cir. 2017) ...........................................................24

*Police Dep't of Chi. v. Mosley,*
    408 U.S. 92 (1972)..................................................................30, 62

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)........................................................................26

*Riddle v. Hickenlooper,*
    742 F.3d 922 (10th Cir. 2014) ...............................................*passim*

*Russell v. Burris,*
    146 F.3d 563 (8th Cir. 1998) ....................................................40, 57

*Sam Party of N.Y. v. Kosinski,*
    987 F.3d 267 (2d Cir. 2021) ...................................................*passim*

*SpeechNow.org v. FEC,*
    599 F.3d 686 (D.C. Cir. 2010) ................................................64, 70

*Ted Cruz for Senate v. FEC,*
    542 F. Supp. 3d 1 (D.D.C. 2021)..............................................*passim*

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994)........................................................................37

*United States v. Playboy Entm't Grp.,*
    529 U.S. 803 (2000)........................................................................49

*Upstate Jobs Party, et al. v. Kosinski,*
    No. 18-1586 (2d Cir. June 13, 2018) ............................................43

*Upstate Jobs Party v. Kosinski,*
    741 F. App'x 838 (2d Cir. 2018)........................................14, 24, 48

*U.S. v. Silver*,
    15-cr-00093 (S.D.N.Y. April 1, 2020) ............................................40

*U.S. v. Skelos*,
    15-cr-00317 (S.D.N.Y. May 16, 2016)...........................................40

*Wagner v. FEC*,
    793 F.3d 1 (D.C. Cir. 2015)....................................................38, 65

## CONSTITUTION, STATUTES AND RULES

U.S. Const. amend. I ....................................................................26

U.S. Const. art. I, §4....................................................................54

11 C.F.R. §100.5(e)(3) .................................................................41

28 U.S.C. §1291 ............................................................................3

28 U.S.C. §1331 ............................................................................3

28 U.S.C. §1343(a)(3) ...................................................................3

28 U.S.C. §2107 ............................................................................3

42 U.S.C. §1983 ............................................................................3

42 U.S.C. §1988 ..........................................................................14

9 N.Y.C.R.R. §6214.0 ..........................................................*passim*

Fed. R. Evid. 201 ........................................................................42

Fed. R. Evid. 901 ........................................................................42

Fla. Stat. §97.021(19)..................................................................44

Fla. Stat. §106.08(1)....................................................................44

N.Y. Elec. Law §1-104 .......................................................*passim*

N.Y. Elec. Law §2-102 .................................................................................7

N.Y. Elec. Law §2-104    .............................................................................7

N.Y. Elec. Law §2-114    .............................................................................7

N.Y. Elec. Law §2-116    .............................................................................7

N.Y. Elec. Law §2-118    .............................................................................7

N.Y. Elec. Law §7-104 ...............................................................................11

N.Y. Elec. Law §14-100 .............................................................................41

N.Y. Elec. Law §14-114 .......................................................................*passim*

N.Y. Elec. Law §14-120 .............................................................................47

N.Y. Elec. Law §14-124 .......................................................................*passim*

N.Y. Elec. Law §14-126 .............................................................................47

Va. Code §§24.2-945, et seq. .....................................................................54

## OTHER AUTHORITIES

David W. Blight, *Frederick Douglass: Prophet of Freedom* 217 (2018) .................2

*State Limits on Contributions to Candidates*, 2021-2022 Election Cycle,
National Conference of State Legislators (Jun. 2021)....................................44

NYBOE, Periodic Report of Conservative Party NYS (Headquarters
Account)(Jan. 2022) ........................................................................42

NYBOE, Periodic Report of New York Republican State Committee's
Housekeeping Account – 9606 (Jan. 2022)........................................42

NYBOE, Periodic Report of New York State Democratic Committee
(Housekeeping) (Jan. 2022)..............................................................42

NYBOE, Periodic Report of Working Families Party, Inc.
Housekeeping (Jan. 2022) ……………………………………………42

# INTRODUCTION

New York justifies its unequal and two-tiered contribution regime on a counterintuitive proposition: as a political party's size decreases, its corruption risk increases. Stranger still is the flip side of that coin: as a party's size increases, its corruption risk decreases. New York's justification defies common sense and experience, and cannot be squared either with New York Law or with the facts of this case. First, New York does not define parties by their size; instead, parties are defined by the number of votes they won in the previous gubernatorial and presidential elections. Second, the State admitted below that it has no evidence that violations of contribution limits have been committed by independent bodies, the statutory term for New York's minor parties. Third, New York's justification imposes a fatal, self-inflicted wound to its defense—if Parties may contribute more to their candidates because New York imposes more administrative requirements, then more regulation of them is necessarily a more closely drawn means to prevent corruption.

New York then follows its asymmetric premise to an asymmetric and unconstitutional conclusion: New York imposes asymmetrical contribution limits on different parties competing in the same election for the same votes. Because doing so "is antithetical to the First Amendment," *Davis v. FEC*, 554 U.S. 724, 743-44 (2008), the district court was right to strike New York's practice as unconstitutional.

In the final analysis, New York overlooks the historically significant role that smaller parties "played in the political development of the Nation." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185-86 (1979). While the Democratic Tammany Hall machine plagued New York politics throughout the nineteenth century, and the Republican Teapot Dome Scandal rocked the New York political scene of the twentieth century, the small Liberty Party, with its western New York base was formed around 1840.[1] The relationship between the small yet influential Liberty Party, funded in part by the great orator and writer Frederick Douglass, led the party to form "the first antislavery political organization to gain genuine traction in America."[2] The union of the Liberty Party and Frederick Douglass led the latter to conclude that the Constitution was an anti-slavery document.[3] And by the first volleys of the American Civil War, "some seventeen Northern states had become politically antislavery."[4]

New York forgets that small parties have done monumental things for this country. For if a happy few could band together as brothers and change the course of history at Agincourt, a happy few can associate together as a party to change course in Albany.

---

[1] David W. Blight, *Frederick Douglass: Prophet of Freedom* 217, 311 (2018).
[2] *Id*. at 106, 215-17 (2018).
[3] *See id*. at 216.
[4] *See id*. at 311.

## STATEMENT OF SUBJECT-MATTER JURISDICTION

Plaintiffs (Upstate Jobs Party, Martin Babinec, and John Bullis) brought claims under 42 U.S.C. §1983, alleging violations of the Free Speech and Association Clauses of the First Amendment to the U.S. Constitution and the Equal Protection Clause of the Fourteenth Amendment. Because Plaintiffs' claims arose under the U.S. Constitution and federal civil-rights statutes, both 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3) vested the district court with subject-matter jurisdiction.

On October 8, 2021, the district court issued an amended decision and order, as well as an amended final judgment. (ECF 82-83). On October 14, 2021, Defendants-Appellants/Cross-Appellees (referred to as "New York" or "Commissioners") timely filed their notice of appeal. (ECF 85). Four days later, Plaintiffs-Appellees/Cross-Appellants timely filed their notice of cross-appeal. (ECF 88).

Accordingly, this Court has subject-matter jurisdiction under 28 U.S.C. §§1291 and 2107.

## STATEMENT OF THE ISSUES

"Parties" are defined as those groups whose gubernatorial and presidential candidates, in the last preceding general election, received votes exceeding a certain percentage threshold. N.Y. Elec. Law §1-104(3). Similarly, Independent Bodies are organizations that nominate candidates for office and then put those candidates forward to the public to be voted upon at the general election. N.Y. Elec. Law §1-104(12). Unlike Parties, Independent Bodies have not achieved the necessary votes in the gubernatorial and presidential elections to achieve Party status. Both organizations, however, compete for votes in the same election.

Accordingly, the questions presented are:

1.      Asymmetrical contribution limits for those competing in the same election are antithetical to the First Amendment. *Davis v FEC*, 554 U.S. 724, 743-44 (2008); *Riddle v. Hickenlooper*, 742 F.3d 922, 929-30 (10th Cir. 2014). New York permits Parties to make *unlimited* contributions to their own candidates but caps contributions made by Independent Bodies to their candidates. Did the district court correctly hold that the First and Fourteenth Amendments prohibit New York's asymmetric campaign-contribution limits, especially when there are more closely drawn means to achieve New York's asserted anti-corruption goals?

2.      Asymmetrical contribution limits for individuals supporting those competing in the same election are antithetical to the First Amendment. *Davis*, 554

U.S. at 744; *Riddle*, 742 F.3d at 929-30. New York permits individuals to contribute $117,300 to Parties. By contrast, when an Independent Body runs a gubernatorial candidate, New York caps individual contributions to Independent Bodies at $47,100. Did the district court correctly hold that the First and Fourteenth Amendments prohibit New York's asymmetric campaign-contribution limits, especially when there are more closely drawn means to achieve New York's asserted anti-corruption goals?

3. Asymmetrical contribution limits for those competing in the same election are antithetical to the First Amendment. *Davis*, 554 U.S. at 744. New York permits Parties to establish Housekeeping Accounts, through which Parties can raise and spend unlimited funds to maintain headquarters, hire staff, and conduct other ordinary activities. By contrast, Independent Bodies are forbidden from establishing Housekeeping Accounts. Do the First and Fourteenth Amendments prevent New York's complete prohibition of Housekeeping Accounts for Independent Bodies, especially when there are more closely drawn means to achieve New York's asserted anti-corruption goals?

## STATEMENT OF THE CASE

The monumental influence of small political parties is woven into the tapestry of New York's storied political history. The Upstate Jobs Party[5] is one of the more recent threads in this tapestry. New York law, however, has unfairly and unconstitutionally depreciated Upstate Jobs Party's ability to contribute to the political marketplace of ideas.

## I. NEW YORK'S ASYMMETRICAL TREATMENT OF MAJOR POLITICAL PARTIES AND INDEPENDENT BODIES.

To organize its ballot order and ballot access statutes, New York creates two categories: one for Parties and the other for Independent Bodies. *Sam Party of N.Y. v. Kosinski*, 987 F.3d 267, 271-72 (2d Cir. 2021); *see also See* Quail Decl. ¶6 (ECF 57-4 at 2) (conceding that the distinction between Parties and Independent Bodies is for ballot access purposes). Parties are those organizations whose gubernatorial and presidential candidates in the previous election each received the greater of 130,000 votes or 2 percent of the total votes cast. *See* N.Y. Elec. Law §1-104(3). Independent Bodies are also those organizations that "nominate[] a candidate or candidates for

_____

[5] Since the notice of appeal was filed, Martin Babinec, John Bullis, and Tim Dunn established an additional and related entity called Unite New York, an entity organized under Section 527 of the Internal Revenue Code. Upstate Jobs Party remains active and maintains its desire to contribute unlimited amounts to its candidates. Upstate Jobs Party also maintains its desire to establish a Housekeeping Account. For his part, Martin Babinec maintains his desire to contribute to Upstate Jobs Party at the same level as a Party, meaning $117,300. SA5-6, 57.

office to be voted for at an election, and which is not a party as herein provided." N.Y. Elec. Law §1-104(12). What differentiates the two is solely the number of votes won by the organization's gubernatorial and presidential candidates in the prior election. SA64.

Parties simultaneously enjoy significant advantages and are subject to additional administrative and filing requirements. *Sam Party*, 987 F.3d at 271. These administrative requirements include statutes regulating the composition of the state party committee and empowering those committees to hold conventions, N.Y. Elec. Law § 2-102; the creation and composition of party county committees, *id*. § 2-104; the ability to prepare rules to govern the party within its political unit and requiring that if such rules are adopted, they must be filed with the state or county board of elections, *id*. § 2-114; the process to remove a member or officer of a party committee, *id*. § 2-116; and lastly, rules about how to fill vacancies, *id*. § 2-118.

But, as this Court recently recognized, the "principal privilege[]" that Parties enjoy is a designated ballot line, which allows the winner of a party's primary to be automatically included on the ballot. *Sam Party*, 987 F.3d at 271-72. By contrast, all Independent Body candidates must endure the burdensome task of obtaining the requisite number of signatures on independent nominating petitions to obtain access to New York's ballots. *See Lerman v. Board of Elections*, 232 F.3d 135, 147-48 (2d. Cir. 2000).

This case does not, however, challenge how New York structures its ballot access, ballot order, or baseline party organizational rules—rules that, as a whole, give Parties a distinct advantage over Independent Bodies. *See Sam Party*, 987 F.3d at 274. Instead, this case challenges New York's imposition of an *additional* structural layer that affects the public discussion about who should govern. The First Amendment prohibits this. *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014).

Despite the important role that smaller political parties have played in New York and across the nation, New York law now places them at a distinct disadvantage on the campaign trail. Specifically, New York has created two separate and unequal campaign finance regimes based on nothing more than the temporary success that an organization's endorsed candidate enjoyed during a recent election.

Parties can receive up to $117,300 from individuals annually. N.Y. Elec. Law §14-114(10); 9 N.Y.C.R.R. §6214.0; SA5 n.2. Furthermore, Parties can establish Housekeeping Accounts, where they can raise and spend unlimited funds for maintenance on their office space, payments to employees, and payments for ordinary expenses "which are not for the express purpose of promoting the candidacy of specific candidates." N.Y. Elec. Law §14-124(3). Parties are also permitted to make unlimited contributions to support their candidates. *Id.* §14-114(3).

Conversely, Independent Bodies must adhere to contribution limits even when supporting their candidates. When an Independent Body is supporting a gubernatorial candidate, an individual may contribute only $47,100 to the Independent Body. *Id.* §14-114(1). And when an Independent Body contributes to its endorsed candidate, it must adhere to the same contribution limit as when an individual contributes to *any* candidate. *Id.* Thus, while the New York Republican State Committee can make unlimited contributions to its gubernatorial candidate, an Independent Body is limited to contributing only $47,100 to its candidate. Lastly, Independent Bodies are banned from establishing Housekeeping Accounts. This ban dilutes the limited contributions they can accept just to keep on their lights and computers. *Id.* §14-124(3).

The Upstate Jobs Party is currently designated as an Independent Body. New York compels the Upstate Jobs Party to compete for votes in the same elections as Parties but subject to inferior and asymmetrical contribution limits. This is unconstitutional.

## II.  UPSTATE JOBS PARTY WAS CREATED TO FIND BIPARTISAN SOLUTIONS TO THE LABOR-RELATED PROBLEMS PLAGUING UPSTATE NEW YORK.

Martin Babinec was born in Little Falls, New York, and graduated from Herkimer County Community College. Babinec Aff., ECF 56-4 ¶2. Beginning in 2007, Mr. Babinec noticed that his hometown was not attracting much college-

educated talent and had one of the lowest in-migration rates in the country. *Id*. ¶3. The Great Recession only exacerbated upstate New York's struggles. *Id*. ¶6.

In early 2016, Mr. Babinec campaigned to replace Republican Congressman Richard Hanna in the U.S. House of Representatives. SA7.[6] Initially registered as a Republican, Mr. Babinec was unable to garner GOP backing due to his previous support of some Democratic candidates with sound pro-job creation policies. (ECF 56-4 ¶20). It was then that Mr. Babinec concluded that the Nation's political discourse needed a course correction. *Id*. ¶21. In his view, partisan loyalty must decrease so that solutions for the common good can increase. *Id*. To accomplish this, Mr. Babinec committed himself to breaking the party duopoly in Albany. *Id*. ¶24.

Mr. Babinec therefore campaigned under the banner of Upstate Jobs Party. SA7. The Upstate Jobs Party is categorized as an Independent Body under New York State law. *Id*. With the help of approximately sixty volunteers, Mr. Babinec obtained the required 3,500 signatures on independent nominating petitions to have his name listed on the ballot. *Id*. And to assist his campaign efforts, Mr. Babinec used his personal money to loan his campaign $2,990,000. *Id*.

Eventually, Mr. Babinec's Upstate Jobs Party line on the ballot was consolidated with the Libertarian line; instead of appearing on his own line, he

---

[6] The "SA" cites are to the Special Appendix filed with Defendant-Appellants/Cross-Appellees brief on January 18, 2022 as ECF 77.

appeared on the Libertarian line with a small notation in 3.5-point[7] font stating that he was the Upstate Jobs Party nominee. *Id*. Although Mr. Babinec lost the election, he received 34,638 votes, or 12.4 percent of the total votes cast. *Id*.

Desiring to seize the momentum gained from the 2016 election, the Upstate Jobs Party worked to build its visibility in 2017. *Id*. On December 27, 2017, the UJP was formally incorporated as Vote Upstate Jobs, Inc, a non-profit organized under Section 501(c4) of the Internal Revenue Code. SA9. In 2017, Upstate Jobs Party spent between $50,000 and $100,000. SA8. These funds were spent on digital messaging, boosting social media, and hosting public meetings where speakers from the Upstate Jobs Party spread its message of job creation and political reform. *Id*.

In 2017, Upstate Jobs Party supported Ben Walsh, the successful independent candidate for Mayor of Syracuse. *Id*. Although the Upstate Jobs Party did not make any contributions, Upstate Jobs Party volunteers successfully circulated sufficient independent nominating petitions to include Mr. Walsh's name on an Upstate Jobs Party ballot line. *Id*. Then, the Upstate Jobs Committee, the Upstate Jobs Party's related independent-expenditure committee made $22,074 in independent expenditures in support of Mr. Walsh. SA9. Mr. Walsh won his election. *Id*.

---

[7] For perspective, for a candidate's name, New York requires a font size of at least nine points. N.Y. Elec. Law §7-104(27)(b).

From the beginning of 2018 through the end of 2019, Upstate Jobs Party held eight public meetings to disseminate its message of bringing innovative jobs to Upstate New York. SA10. This included two focus group sessions with a notable pollster. SA11; *see also* (ECF 56-2 ¶44). Upstate Jobs Party also endorsed ten candidates from multiple political parties. SA10-SA12. Additionally, Upstate Jobs Party volunteers circulated sufficient independent nominating petitions to get the Republican candidate for State Senate, Bob Antonacci, on the ballot as an Upstate Jobs Party candidate. SA10. Mr. Antonacci received 347 votes on the Upstate Jobs Party ballot line. *Id.*

From 2018 through 2019 Upstate Jobs Party received over $88,000 in contributions and spent most of those funds on consultant and media fees. *Id.* Its independent expenditure committee, the Upstate Jobs Committee[8], received $240,898 in contributions from Mr. Babinec and spent $134,459.08 on independent expenditures to support ten candidates. SA11-SA12.

Every principal, employee, vendor, and independent contractor from both the Upstate Jobs Party and the Upstate Jobs Committee has reviewed, approved, and executed a firewall compliance policy to further prevent the use of private information obtained from meetings between Upstate Jobs Party officials and

---

[8] Since the Notice of Appeal was filed, the Upstate Jobs Committee has changed its name to Vote Unite New York.

candidates in the crafting and disseminating of independent expenditures by the Upstate Jobs Committee. SA14. Part of the firewall policy requires that the Upstate Jobs Committee base its decisions about whether to make an independent expenditure solely on publicly available information. SA15. The policy has been strictly enforced. *Id.*

The Upstate Jobs Party has never received funds from the Upstate Jobs Committee; similarly, the Upstate Jobs Committee has never received funds from the Upstate Jobs Party. SA17. For its part, the New York State Board of Elections has no record of any enforcement action brought against Upstate Jobs Party, (or any other Independent Body), for violations of (1) the limit on contributions from individuals to Independent Bodies, (2) the limit on contributions from Independent Bodies to candidates, or (3) the limits on Independent Bodies establishing a Housekeeping Account. *Id*.

## III. UPSTATE JOBS PARTY SUES TO COMPETE ON EQUAL TERMS WITH MAJOR POLITICAL PARTIES.

Because of the disadvantages imposed on the Upstate Jobs Party, Plaintiffs challenged New York's Election Law on First and Fourteenth Amendment grounds. Plaintiffs sought a declaration that New York's asymmetric contribution limit statutes are unconstitutional because they (1) permit Parties to make unlimited contributions to their candidates, N.Y. Elec. Law §14-114(3), while capping the amount that the Upstate Jobs Party may contribute to its candidates. *id.* §14-114(1);

(2) permit Parties to establish Housekeeping Accounts but bans Independent Bodies, like Upstate Jobs Party, from doing the same, *id.* §14-124(3); and (3) permit individuals like Martin Babinec to contribute $117,300 to Parties, but only $47,100 to Independent Bodies when it supports a gubernatorial candidate, *id.* §14-114(1), (10); 9 N.Y.C.R.R. §6214.0.

Next, Plaintiffs requested a court order that permitted the Upstate Jobs Party to raise and spend contributions on the same level as Parties. This is so that Independent Bodies could compete for votes on an equal playing field.

Plaintiffs also requested that the district court enjoin Defendants, their agents, and assigns from enforcing N.Y. Elec. Law §§14-114(1), 14-114(3), 14-114(10), 14-124(3), and 9 N.Y.C.R.R. §6214.0[9] against Upstate Jobs Party and Mr. Babinec.[10]

After the district court denied Plaintiffs' motion for a preliminary injunction, SA60 n.21, Plaintiffs appealed to this Court. *See Upstate Jobs Party v. Kosinski*, 741 F. App'x 838 (2d Cir. 2018). Although the Court found that the district court had not abused its discretion, it nonetheless observed that "the merits of UJP's challenge raise serious questions of free expression and equal treatment under the law, as well as the appropriate standard of judicial review." *Id.* at 839. In this Court's view, the

---

[9] This is the regulation that establishes the contribution limits for the current election cycle.

[10] Plaintiffs have also sought recovery of their attorneys' fees under 42 U.S.C. §1988. (ECF 1 at 27).

parties needed to further develop the record to establish whether the challenged laws "employ[ed] means closely drawn" to their anti-corruption justification to avoid "unnecessary abridgment of associational freedoms." *Id*. at 840.

## IV. THE DISTRICT COURT LARGELY SIDES WITH UPSTATE JOBS PARTY.

On October 8, 2021, Chief Judge Suddaby of the U.S. District Court for the Northern District of New York issued his amended opinion granting summary judgment for Plaintiffs on their counts regarding contributions from individuals to parties and contributions from parties to their candidates.[11] SA70. The court, however, denied Plaintiffs' summary-judgment motion for their counts concerning the constitutionality of New York's prohibition on independent bodies establishing a Housekeeping Account. *Id.*

The district court began its analysis by defining the proper level of scrutiny. SA47-SA51. For First Amendment challenges to contribution limits it applied a tier of scrutiny lower than "strict" yet still "rigorous." SA48 (quoting and citing *McCutcheon*, 572 U.S. at 197). Under this standard, states must demonstrate that a statute is aimed at a sufficiently important interest and employs means that are closely drawn "to avoid unnecessary abridgment of associational freedoms." *Id*. (quoting and citing *McCutcheon*, 572 U.S. at 197). This standard requires courts to

---

[11] *See* Op. Br. 16 n.11.

"assess the fit between the stated government objective and the means selected to achieve that objective." *Id*. (quoting *McCutcheon*, 572 U.S. at 199). Although this standard does not require a perfect fit, it does require narrow tailoring to the state's objective. *Id.* (quoting *McCutcheon*, 572 U.S. at 218). The state retains the burden of demonstrating the constitutionality of its actions. SA49 (quoting *McCutcheon*, 572 U.S. at 210). For claims under the Fourteenth Amendment, and particularly those alleging violations of fundamental rights, courts apply strict scrutiny. SA49-SA50.

### A. The District Court Strikes the Asymmetrical Campaign-Contribution Limits.

Next, the district court analyzed Plaintiffs' challenges to New York's asymmetric contribution limits. SA51-SA66. The district court rightly identified the only legitimate interest for restricting campaign contributions as preventing actual or apparent *quid pro quo* corruption. SA52 (citing *McCutcheon*, 572 U.S. at 207). It also clarified that influence over or access to legislators does not qualify as *quid pro quo* corruption. *Id*. (citing *McCutcheon*, 572 U.S. at 208).

The district court held that the challenged contribution limit statutes are targeted at *quid pro quo* corruption. SA53-SA55. It also held that the government met its burden of proving that the contribution-limit statutes target *quid pro quo* corruption because New York's argument—that as the size of a party decreases, its risk of apparent *quid pro quo* corruption increases—is "logical" and "has at least a

tendency to occur." SA54. It then found, however, that the contribution limits were insufficiently neither closely drawn nor narrowly tailored. SA56-SA62.

The court observed that the State Board "has no record of *any* enforcement action brought against Independent Bodies for violations of the contribution limit from individuals or contributions from Independent Bodies to candidates." SA57 (citing *Ted Cruz for Senate v. FEC*, 542 F. Supp. 3d 1, 12-13 (D.D.C. 2021) (three-judge court), *jurisdiction postponed until hearing on the merits* 142 S. Ct. 55 (oral argument held Jan. 19, 2022) (emphasis added). The court then rejected the argument that disclosure of contributions, a less-restrictive option, is ineffective or infeasible. SA60. In other words, the district court found "the mere fact that Parties are more regulated than Independent Bodies does not establish that the statutes at issue are closely drawn to address *quid pro quo* corruption." SA58.

Without evidence of ***actual*** *quid pro quo* corruption, the court considered whether they address ***apparent*** *quid pro quo* corruption. SA58-SA62. After rejecting the Commissioners' hypothetical parade of horribles, the court recognized that permitting Mr. Babinec to contribute to Upstate Jobs Party at the same level as he can contribute to the New York Republican State Committee does not increase the appearance of corruption. SA59. In other words, the Commissioners failed "to justify how the *disparate* contribution limits combat the appearance of *quid pro quo* corruption." *Id*.

When analyzing Plaintiffs' challenge to New York's asymmetric contribution limits under the Equal Protection Clause, the court held that Parties and Independent Bodies are similarly situated because New York defines Parties and Independent Bodies as organizations that compete for votes in an election. SA63-SA64. For that reason, New York may not "stifle and/or limit the voices or messages from Independent Bodies based solely on their size." SA64. Accordingly, the court found that the unequal contribution limits violate Plaintiffs' fundamental rights, finding that the challenged contribution limits were not the least restrictive means. *Id.*

## B. The District Court Declines to Find That the Housekeeping-Account Prohibition Violates the U.S. Constitution.

In contrast, the district found no constitutional transgression with New York's prohibition on the establishment of housekeeping accounts by independent bodies. SA66. It found a significant threat of *quid pro quo* corruption, reasoning that if Independent Bodies had Housekeeping Accounts, they could spend money on anything except things "'for the express purpose of promoting the candidacy of specific candidates,' which could include lavish perks, bonuses, or even expenditures that indirectly promote the candidacy of specific candidates." SA65-SA68. For the district court, the risk is more acute with Independent Bodies because New York has chosen not to regulate Independent Bodies as extensively as Parties. *Id.*

In the district court's view, Mr. Babinec's three hats—director of the Upstate Jobs Party Board, director of the Upstate Jobs Committee Board, and the party's largest donor—aggravated that concern, despite the firewalls in place. *Id*; *see also id*. at 13-17. The district court believed that Upstate-Jobs-Party-supported candidates will know that Mr. Babinec donated the most money to the Party's Housekeeping Account, which could cause those candidates to feel obligated to Mr. Babinec. *Id*. Because New York's statutory disparity in regulation between Independent Bodies and Parties, the district court concluded that New York's Housekeeping Account prohibition survived both First and Fourteenth Amendment scrutiny. SA68-SA69. And for the same reasons, the court also held that New York satisfies the least restrictive means standard. *Id*.

\* \* \*

The court permanently enjoined the Commissioners of the New York State Board of Elections, their agents, and assigns from enforcing the asymmetric contribution limits codified at N.Y. Elec. Law §§14-114(1) and (3) against Upstate Jobs Party, SA71, and permanently enjoined the Defendants, their agents and assigns from enforcing N.Y. Elec. Law §§14-114(1) and (10) against Plaintiff Martin Babinec, thus allowing Mr. Babinec to contribute up to $117,300 to the Upstate Jobs Party. It left intact, however, the prohibition on Independent Bodies from

establishing housekeeping accounts, meaning that Upstate Jobs Party remains at a distinct fundraising disadvantage as compared to Parties. SA70.

The Defendants first, (ECF 85), then the Plaintiffs, (ECF 88) filed timely notices of appeal.

## SUMMARY OF THE ARGUMENT

For ballot access purposes, New York divides that world into two parts: Parties and Independent Bodies. What distinguishes the two is merely the number of votes obtained in the prior gubernatorial and presidential election. Parties have obtained their status because they won the requisite number of votes in those elections. Conversely, Independent Bodies have not won the requisite number of votes. One benefit of Party status is that Parties have a guaranteed ballot line while Independent Bodies do not. Because both Parties and Independent Bodies are competing for votes in every election, they are similarly situated.

But New York takes this Party/Independent Body dichotomy and transports them into its campaign finance rules, thus creating asymmetric contribution limits. Thus Parties, can raise and spend unlimited funds for Housekeeping Account purposes. But Independent Bodies are banned from establishing a Housekeeping Account. Parties can make unlimited contributions to their candidates while an Independent Body's contributions to its candidate are limited to the same level as an individual's contributions to *a* candidate. Lastly, an individual can contribute

$117,300 to a Party. But, if an Independent Body is running a gubernatorial candidate, an individual can contribute $44,100 to the Independent Body. New York creates these asymmetries even though it is antithetical to the First Amendment and to the Fourteenth Amendment's Equal Protection Clause to impose different contribution limits on candidates and parties when they compete for votes in the same election.

Initially, Plaintiffs brought an as-applied challenge to New York's asymmetric contribution regime. As for the appropriate level of scrutiny, New York bears the burden of justifying its asymmetric contribution limits and ban. Under the First Amendment, New York must demonstrate that its statutes protect a compelling or sufficiently important interest. Here, the only interest the Supreme Court has identified is the prevention of actual or apparent *quid pro quo* corruption. If New York satisfies its burden here, then New York must show that it uses means that are narrowly tailored. New York must satisfy both prongs of closely drawn scrutiny with an evidentiary showing. And if Plaintiffs can demonstrate that there are more closely drawn means available, New York must refute that those are ineffective at achieving the stated interest. New York's burden is similar under equal protection analysis, requiring a compelling interest and uses means that are the least restrictive.

New York justifies its asymmetric contribution regime with asymmetric reasoning. As the size of the political party decreases, the risk of corruption

increases. Conversely, as the size of the political party increases, the risk of corruption decreases. But this reasoning has no basis in New York law or the facts.

*First*, New York is also without evidence of actual or apparent corruption to permit Parties to make *unlimited* contributions to its candidates but substantially *limit* the contributions from Independent Bodies to their candidates. Initially, as a matter of New York law, political parties cannot corrupt its candidate, which is why New York permits *unlimited* contributions from Party to candidate. New York failed to adduce evidence that Independent Bodies pose a greater risk of corruption than Parties meriting the asymmetric treatment. In fact, there is no evidence of actual *quid pro quo* corruption involving Independent Bodies generally or Upstate Jobs Party specifically. New York also does not adduce evidence of apparent *quid pro quo* corruption because New York's argument is based on its asymmetric premise—the smaller the party, the greater the risk corruption—an argument that has no foundation in New York law. Furthermore, there are more narrowly tailored means available that New York did not refute. The district court was right to declare this asymmetric limit unconstitutional under both the First Amendment and the Fourteenth Amendment's Equal Protection Clause.

*Second*, New York is also without evidence of actual or apparent corruption to permit Individuals like Martin Babinec to contribute $117,300 to Parties but then only $44,100 to Independent Bodies, if the Independent Body is running a

gubernatorial candidate. There is no evidence of actual or apparent corruption involving Independent Bodies generally or UJP specifically. Furthermore, there are more narrowly tailored means available. The district court was correct to declare this asymmetric limit unconstitutional under both the First Amendment and the Fourteenth Amendment's Equal Protection Clause.

*Third*, as for Plaintiffs' Cross-Appeal, New York is without an interest to ban Independent Bodies from establishing a Housekeeping Account. Contributions to a Housekeeping Account cannot constitute actual or apparent corruption since New York law prohibits money from flowing to a candidate. Furthermore, contributions from a political party to the parties' candidate cannot constitute actual or apparent corruption.

Even if there is evidence actual or apparent corruption justifying New York's ban on Independent Bodies establishing a Housekeeping Account, New York failed to submit evidence that the means it uses are narrowly tailored. In fact, there are more narrowly tailored means that New York did not refute. New York could enact anti-proliferation statutes, strengthen its anti-earmarking statutes, and enact contribution limits that would close the current disparity between Parties and Upstate Jobs Party.

## STANDARD OF REVIEW

This Court reviews the district court's summary-judgment ruling *de novo*. *Panzella v. Sposato*, 863 F.3d 210, 217 (2d Cir. 2017). Furthermore, with each party's motion, this Court construes the evidence below in the light most favorable to the non-moving party. *See id*.

Because this case involves the constitutional right to free speech and association, this Court must "'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984)). Indeed, this Court must remain "profoundly skeptical" of New York's defense of its contribution limits. *Hankard v. Town of Avon*, 126 F.3d 418, 422 (2d Cir. 1997) (internal quotations omitted).

## ARGUMENT ON APPEAL

This Court previously recognized that "the merits of UJP's challenge raise serious questions of free expression and equal treatment under the law, as well as the appropriate standard of judicial review." *Upstate Jobs Party*, 741 F. App'x at 839 (citing *McCutcheon*, 572 U.S. at 185). As this Court noted, although New York "defends the challenged laws as protecting against corruption (or the appearance thereof)," it adduced no evidence to support this justification, and thus "the existing

record raises questions as to whether the challenged statutes 'employ[] means closely drawn to avoid unnecessary abridgment of associational freedom.'" *Id.* at 840 (quoting *McCutcheon*, 572 U.S. at 197).

After nearly twelve months of discovery, New York failed to plug this evidentiary hole. The foundational premise underlying New York's unequal treatment of political organizations—that the smaller the party, the greater the corruption risk—remains entirely unsupported, but it has nonetheless resulted in asymmetric and ultimately unconstitutional contribution limits. Simply put, New York cannot enact asymmetric contribution limits for parties that are competing for the same votes in the same election. New York has also failed to adduce evidence that its asymmetric treatment of Independent Bodies is closely drawn to avoid unnecessarily infringing First Amendment rights.

## I.     THE LEVELS OF SCRUTINY THAT GOVERN THIS CASE.

### A. PLAINTIFFS BRING AN AS-APPLIED CHALLENGE.

Plaintiffs' Complaint asks for a declaration "that *as currently selectively applied to Plaintiffs*," certain provisions of New York's election code are unconstitutional, and seeks relief applicable solely to Plaintiffs. Compl. at 26-27 (ECF 1); *but see* Op. Br. at 22-23. In fact, Plaintiffs' Complaint expressly rejects New York's argument, noting that "Plaintiffs do not seek to strike down" provisions

of New York's election code, "but seek to have those statutes applied to UJP in the same manner as Parties…." (ECF 1, ¶7).

Ultimately, the distinction between as-applied and facial challenges goes more to the breadth of the remedy applied by the Court; it does not concern what must be pleaded in a Complaint. *Citizens United v. FEC*, 558 U.S. 310, 331 (2010).

### B. The First Amendment Compels Courts to Apply "Rigorous" Scrutiny to Laws Affecting Political Contributions.

The First Amendment emphatically proclaims that "Congress shall make no law abridging the freedom of speech." U.S. CONST. amend. I.[12] "Premised on mistrust of governmental power," the First Amendment stands at "its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, 558 U.S. at 339-40 (quotations omitted). Accordingly, the Amendment's purpose is "to remove governmental restraints from the arena of public discussion" and to empower individuals with the prerogative to decide which views are disseminated in the public square. *See McCutcheon*, 572 U.S. at 203. Stated more succinctly, it enshrines an individual's right "to participate in the public debate through political expression and association," *id*., and "to participate in electing our political leaders," *id.* at 191.

---

[12] This prohibition applies with equal force to New York by virtue of the Fourteenth Amendment. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

One way that a citizen can exercise this right is to contribute to a political candidate's campaign and to that candidate's party. *See id.* In so doing, the individual exercises his rights of both political expression and association because his contribution constitutes a "general expression of support for the candidate and his views and serves to affiliate [him] with [the] candidate." *Id.* at 203. Accordingly, "[t]he right to participate in democracy through political contributions is protected by the First Amendment." *Id.* at 191.

Limitations on contributions, although they "permit[] the symbolic expression of support," infringe the right of a contributor to associate with the candidate he supports." *Id.* at 197. Accordingly, when evaluating contribution limits, courts require states like New York to "demonstrate[] a sufficiently important interest" and use means that are "closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* (citation omitted). At both steps of the analysis, New York "bears the burden of proving the constitutionality of its actions." *Id.* at 210 (citation omitted).

This scrutiny has rightly been described as rigorous, *id.* at 197, and "[p]reventing corruption [and] the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances," *Davis*, 554 U.S. at 741 (citation omitted).

In contrast to corruption prevention, States have no license to limit contributions for the purpose of preventing either ingratiation or access to elected

officials. Both ingratiation and access "embody a central feature of democracy—constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *See McCutcheon*, 572 U.S. at 191-92.[13] Similarly impermissible are attempts to "equaliz[e] the financial resources of candidates" or to "level electoral opportunities, . . . . no matter how well intentioned." *Id*. at 207 (internal citations omitted). This is so because "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Id*. (quoting *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976)).

For this reason, New York can regulate campaign contributions only if it does so to prevent *quid pro quo* corruption or its appearance. *Quid pro quo* corruption refers to the "direct exchange of an official act for money." *McCutcheon*, 572 U.S. at 192. It is therefore impermissible for the Government to limit the "appearance of mere influence or access." *Id*. at 208. When trying to prevent apparent corruption, New York may target only the "impact of the appearance of corruption stemming from public awareness of such a system of unchecked direct contributions." *Id*.

---

[13] *See also Green Party of Conn. v. Garfield,* 616 F.3d 189, 207 (2d Cir. 2010) (ruling that influence and access are not sinister or corrupt but instead are unavoidable in representative politics).

(internal quotations omitted). To expand the government's regulatory interest beyond this narrow zone would "impermissibly inject the Government into the debate over who should govern." *Id*. at 192 (internal quotations omitted). This conclusion is buttressed by the recognition that the First Amendment "requires us to err on the side of protecting political speech rather than suppressing it." *Id*. at 209.

Once New York proves that its statute targets *quid pro quo* corruption, it must then prove that the means it uses to prevent actual or apparent *quid pro quo* corruption are "narrowly tailored to achieve the desired objective." *Id*. at 218 (citation omitted). Stated differently, to survive "rigorous" review, New York must use means that avoid unnecessarily abridging First Amendment freedoms. *See id*. at 199.

## C. NEW YORK'S ASYMMETRICAL CONTRIBUTION LIMITS VIOLATE THE EQUAL PROTECTION CLAUSE.

Because New York imposes a two-tiered asymmetric campaign finance regime, imposing substantially lower contribution limits for Independent Bodies, the challenged statutes also fail under the Equal Protection Clause's strict scrutiny analysis. *Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652, 666 (1990), *overruled on other grounds by Citizens United*, 558 U.S. at 365; *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 879-80 (8th Cir. 2012) (*en banc*) (stating that *Austin*'s equal protection analysis remains good law).

The Supreme Court has ruled that "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 101 (1972). Strict scrutiny is appropriate here because New York is selectively infringing the free speech rights of Independent Bodies and their supporters. *See Riddle*, 742 F.3d at 927-28; *id*. at 931-32 (Gorsuch, J., concurring).

*First*, contrary to the Commissioners' assertion, Op. Br. at 28, the district court's opinion declared the challenged contribution limits unconstitutional under *both* closely drawn and strict scrutiny. SA65. Furthermore, federal and state courts have applied strict scrutiny to contribution limits when those limits distinguish between similarly situated speakers. *Dallman v. Ritter*, 225 P.3d 610, 634-635 (Colo. 2010) (holding that Colorado's law violated the Equal Protection Clause's strict scrutiny analysis where Colorado permitted corporate contributions to candidates but prohibited labor union contributions); *Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 603 (8th Cir. 2013) (applying strict scrutiny under the Equal Protection Clause to analyze Iowa statute that prohibited corporate contributions but permitted labor union contributions); *Riddle*, 742 F.3d at 930 (holding that Colorado's asymmetrical contribution limits between major and minor-party candidates violated the Equal Protection Clause). And although this Court has rejected a Fourteenth Amendment challenge alleging that New York City's differing

contribution limits constituted viewpoint discrimination, it did so because the plaintiffs failed to produce evidence that, for example, businesses and labor organizations represent one single viewpoint. *Ognibene v. Parkes*, 671 F.3d 174, 192-93 n.19 (2d Cir. 2011). Ultimately, the Supreme Court has acknowledged that there is vigorous debate between applying strict or closely drawn scrutiny to contribution limits. *McCutcheon*, 572 U.S. at 199. Only because the federal aggregate contribution limit statute failed even under closely drawn scrutiny did the Court decide not to revisit the distinction. *Id.*

New York's selective infringement of Independent Bodies' political speech through asymmetric contribution limits neither serves a compelling nor a sufficiently important interest. Nor too are the limits narrowly tailored. Furthermore, the New York legislature did not have evidence to justify its asymmetric contribution regime. Accordingly, this Court should declare the challenged statutes unconstitutional.

### D. Independent Bodies are Similarly Situated With Parties Because They are Both Seeking Votes for Their Candidates.

Independent Bodies are defined in terms of an organization or group that nominates candidates for office and then puts those candidates forward to the public to be voted upon at the general election. N.Y. Elec. Law §1-104(12). Similarly, Parties are simply those same exact groups whose gubernatorial and presidential candidates received a certain number of votes in the preceding election. *Id.* §1-104(3). As the district court correctly recognized, what distinguishes the two is

simply how many votes their presidential and gubernatorial candidates received in the preceding election. SA64. At the heart of the matter, Parties and Independent Bodies are similarly situated; they both compete for votes by nominating candidates to place before the public in the general election. *Id.* This is the essence of a political party. *See Kusper v. Pontikes*, 414 U.S. 51, 58 (1973) ("[A] basic function of a political party is to select the candidates for public office to be offered to the voters at general elections.").

That New York's statutes create distinctions between Parties and Independent Bodies is precisely why the similarly situated analysis is required to determine if the separate classification is justified. It is not proof of a difference that shields the law from equal protection analysis. *See* Op. Br. at 45-46; *Frontiero v. Richardson*, 411 U.S. 677, 690- 91 (1973) (holding that men and women in the military are similarly situated for purposes of increased military allowances and benefits).

Furthermore, Parties must requalify for Party status every two years, thus meaning Parties could lose their status solely because they did not receive sufficient votes in the preceding general election. *See Sam Party*, 987 F.3d at 272-73 (noting that there are only four recognized political parties after the November 2020 elections); SA54 n.16 (noting that as of November 2020, New York had eight recognized political parties and now there are only four recognized political parties).

Every election, Independent Bodies and Parties are competing for votes. That is what makes the two similarly situated.

Ultimately, it is antithetical to the First Amendment to impose different contribution limits on those parties who are competing in the same election for the same votes. *See Davis*, 554 U.S. at 744.

## II. NEW YORK'S ASYMMETRICAL CONTRIBUTION LIMITS VIOLATE THE FIRST AMENDMENT.

A Party's gubernatorial candidate is entitled to unrestricted financial support from its Party. By contrast, an Independent Body's gubernatorial candidate can only receive $47,100 from the Independent Body. N.Y. Elec. Law §14-114(1), (3); N.Y. Comp. Codes R. & Regs. tit. 9, §6214.0. Similarly, New York permits individual contributors, like Plaintiff Martin Babinec, to contribute $117,300 annually to Parties. N.Y. Elec. Law §14-114(10). But that same contributor is limited to just $47,100 to an Independent Body if that Independent Body is fielding a gubernatorial candidate. N.Y. Elec. Law §14-114(1). SA5 n.2.

New York's two-tiered asymmetrical system "creates a basic favoritism between candidates vying for the same office." *Riddle*, 742 F.3d at 929. By establishing different contribution limits, for both contributions made to and by Parties and Independent Bodies, New York places its thumb on the scales in favor of major Parties. The asymmetrical and unequal limits place candidates running against each other for the same office at a comparative disadvantage. This

asymmetry violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. *Davis*, 554 U.S. at 744; *Riddle*, 742 F.3d at 930.

**A.    The Supreme Court Forbids the Imposition of Different Contribution Limits for Different Competitors in the Same Election.**

When First-Amendment-protected campaign-contribution limits are assessed, equality is the Supreme Court's watchword. Specifically, in *Davis*, the Supreme Court considered the constitutionality of a regime that imposed different limits "on candidates competing for the same congressional seat." 554 U.S. at 728. In that case, if a candidate spent more than $350,000 of his personal funds on his campaign, he could receive no more than $2,300 per election from other contributors, the standard contribution limit. *Id*. at 729. His opponent, however, could receive $6,900 per election from contributors. *Id*. The non-self-financing candidate could also receive unlimited coordinated party expenditures. *Id*.

In finding this asymmetry unconstitutional, the Supreme Court reiterated that it had never upheld "the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other," *id*. at 738, because such discordant treatment is "antithetical to the First Amendment." *Id*. at 744. This principle flows from *Buckley*'s conclusion that the government may not restrict "the speech of some elements of our society in order to enhance the relative voice of others." *Id*. at 741-42 (quoting *Buckley*, 424 U.S. at 48-49). Although the Supreme

Court has allowed governments to regulate campaign-finance in response to corruption concerns, the *Davis* Court found that the regime at issue in that case undermined the anti-corruption interest because Congress *increased* the per-election contribution limit for non-self-financing candidates, *id*. at 741, thereby determining that the interest of preventing actual or apparent corruption is not imperiled by higher caps. *See id.* at 741-42.

The Tenth Circuit built off the principles announced in *Davis* when it decided *Riddle*, a case with facts analogous to those at issue here. *Riddle* analyzed the disparity between Colorado's contribution limits for major and minor-party candidates. *See Riddle*, 742 F.3d at 924-25. Because Republicans and Democrats (*i.e.*, Colorado's major parties) were statutorily required to participate in primary elections, the major-party candidates could receive $400 from individuals to be used in either the primary or general election. *Id*. Conversely, independent candidates were allowed to receive no more than $200 from individuals because independent candidates did not participate in primary elections. *Id*. At its core, then, "the statute treated contributors differently based on the political affiliation of the candidate being supported." *Id*. at 927.

The Tenth Circuit struck down this asymmetrical system. In its view, the different contribution limits might have advanced the state's anti-corruption interests if independent candidates "were more corruptible (or appeared more corruptible)

than their Republican or Democratic opponents." *Id*. at 928. But because Colorado never adduced evidence or even argued that point, the statute failed closely drawn scrutiny. *Id*. It made no difference that major-party candidates must spend more money than independents to "clear the field" of primary competitors because this "cost" interest is separate and distinct from preventing actual or apparent *quid pro quo* corruption. *Id*. What mattered was the major-party-candidate favoritism written into the law. *Id*. at 929. Simply put, the creation of "different contribution limits for individuals running against one another" did not survive constitutional scrutiny. *Id*.

Then-Judge Gorsuch, in his concurring opinion, also found "something distinct, different, and more problematic afoot when the government *selectively* infringes on a fundamental right." *Id*. at 932 (Gorsuch, J., concurring) (emphasis in the original). As for Colorado's justification that major-party candidates need more money because they compete in primary elections, Judge Gorsuch expressed doubt that a state could justify unequal treatment because of a "'problem' of its own creation." *Id*. Equality, then, remained the watchword.

### B. New York's Asymmetrical Contribution Regime Cannot Survive First or Fourteenth Amendment Scrutiny.

Based on the foregoing analyses, New York's asymmetrical contribution caps cannot survive First Amendment or Fourteenth Amendment equal protection scrutiny, and the district court was right to enjoin the laws that allowed this discriminatory treatment. By permitting Parties to make unlimited contributions to

their candidates but substantially limiting Independent Bodies' contributions to theirs, New York imposed "different contribution *and coordinated party expenditure* limits on [parties] vying for the same" votes. *Davis*, 554 U.S. at 744 (emphasis added). This is antithetical to the First Amendment and the Equal Protection Clause, and New York has failed to justify it. *Id.*; *Riddle*, 742 F.3d at 930.

1.    New York Failed to Show That its Regime Targeted Actual *Quid Pro Quo* Corruption.

Targeting *quid pro quo* corruption is the only sufficiently important, and compelling interest deemed capable to regulate campaign finances. *Davis*, 554 U.S. at 741.

As an initial matter, the district court gave New York too much credit right out of the gate. When a Court evaluates a statute that regulates speech under intermediate scrutiny, the government must adduce evidence that the statute targets actual or apparent *quid pro quo* corruption. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994).[14] Requiring such evidence makes sense here; indeed, if the

---

[14] *See also Colo. Republican Fed. Campaign Comm. v. FEC,* 518 U.S. 604, 618 (1996) (applying the *Turner* standard to campaign finance regulations requiring that the FEC must "point to record evidence or legislative findings suggesting any special corruption problem"); *Buckley*, 424 U.S. at 27 (stating that the substantial evidence before the court of large campaign contributions demonstrating *quid pro quo* corruption shows that the problem is not "illusory."); *McConnell v. FEC*, 540 U.S. 93, 185 n.72 (2003) (stating that to prevent Congress from passing opportunistic campaign finance laws, Congress is required to show "concrete evidence that a particular type of financial transaction is corrupting or gives rise to the appearance of corruption").

government must show via evidence that a problem it seeks to address is "real" in the commercial-speech context, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001), which enjoys far less First Amendment protection, then certainly it must do so when political speech—that expression that lies at the First Amendment's core, *Citizens United*, 558 U.S. at 329-30—is on the line.

The Supreme Court has policed this requirement. In *McConnell*, for instance, the FEC defended a ban on contributions from minors as necessary to prevent parents from making contributions through their children that exceeded the limits on their own contributions. *McConnell*, 540 U.S. at 232. In rejecting this argument, the Court faulted the FEC for providing scant evidence of such fraud occurring and inferred the statutory prohibition on contributing in the name of another had already solved this problem. *Id*. Without more evidence, the FEC failed to prove that the statute targeted corruption. *Id.* (citing *Nixon v. Shrink Mo. Gov't Pac*, 528 U.S. 377, 391 (2000)). Conversely, when courts have upheld contribution limits, the evidentiary records in those cases are robust. *See Cruz*, 542 F.Supp.3d at 13.[15]

---

[15] *See, e.g.*, *id*. (noting that the record in *McConnell* "consisted of more than 100,000 pages, including 576 pages of proposed findings of fact and the testimony and declarations of over 200 fact and expert witnesses" (internal quotation marks omitted)); *Ognibene*, 671 F.3d at 189-91 (detailing the evidence before the city council and the Court, including reports, investigations over an eight-year span, and deposition testimony all demonstrating that the council was justified in enacting limits on contributions from government contractors to prevent actual or apparent corruption); *Wagner v. FEC*, 793 F.3d 1, 10-14 (D.C. Cir. 2015) (*en banc*) (detailing

This Court's ruling in *Ognibene* is not to the contrary. *But see* Defs.' Op.Br. at 31-32. There, this Court simply held that the government is not required to show actual corruption to prove apparent corruption. *Ognibene*, 671 F.3d at 188. To require evidence of actual corruption in every case would conflate the two separate interests—actual *and* apparent *quid pro quo* corruption—into one. *Id*.

New York has not, and cannot, demonstrate that its asymmetrical contribution regime targets actual *quid pro quo* corruption. In its view, no concern arises when established Parties make contributions to their candidates in *unlimited* amounts. N.Y. Elec. Law §14-114(3); *see Davis*, 554 U.S. at 737. In other words, New York believes that Parties cannot corrupt their own candidates. On this point, at least, New York is in good company.[16]

Rather than help its case, however, New York's position undermines it. Because New York has already determined that despite recent examples of

---

the history of the ban on federal contractor contributions to candidates, dating back to at least the 1940s and which was the result of a "decades-long congressional effort to prevent corruption and ensure the merit-based administration of the national government"); *FEC v. Beaumont*, 539 U.S. 146, 152-55 (2003) (detailing the history of the century-long ban on corporations making contributions in federal elections).

[16] *See Colo. Republican Fed. Campaign Comm.*, 518 U.S. at 616-18; *id*. at 616 (Breyer, J., joined by O'Connor & Souter, JJ.) ("We are not aware of any special dangers of corruption associated with political parties."); *id*. at 646 (Thomas, J., joined by Rehnquist, C.J., and Scalia, J., concurring in judgment and dissenting in part) (rejecting the notion that a party can corrupt its candidate).

corruption from Parties—Republican Dean Skelos[17] and Democrat Sheldon Silver,[18] for example—*unlimited* contributions from Parties to their candidates does not trigger actual *quid pro quo* corruption, "it is hard to imagine how the denial of [the same] to [small Independent Bodies] can be regarded as serving anticorruption goals sufficiently to justify" treating them differently. *Davis*, 554 U.S. at 741. Instead, campaign finance law is primarily targeted at the risk of *quid pro quo* corruption posed from *large* contributions to candidates, not the size of organizations, large or small. *See Buckley*, 424 U.S. at 26-27.[19] Other than simply saying so, New York has offered no evidence to show that its asymmetrical concern has any basis in fact.

The district court, however, seemed persuaded by the notion that, because Independent Bodies have few contributors and members, they are necessarily more prone to actual or apparent corruption. *See* SA54. In so concluding, the court misunderstood the law it was examining. New York does not distinguish between Parties and Independent Bodies based on the size of their membership but instead

---

[17] *See U.S. v. Skelos*, 15-cr-00317 (S.D.N.Y. May 16, 2016) (ECF 196) (judgment)

[18] *See U.S. v. Silver*, 15-cr-00093 (S.D.N.Y. April 1, 2020) (noting affirmance of some convictions).

[19] *See, e.g.*, *Russell v. Burris*, 146 F.3d 563, 572 (8th Cir. 1998) (stating that if any contribution is likely to give rise to actual or apparent corruption, "it would be one from an entity permitted to contribute two-and-a-half times the amount that most others are allowed to contribute"); SA57-59 (noting that raising Independent Body contribution limits to the same level as Parties does not alter the risk of *quid pro quo* corruption already in the system)

based on how many votes they receive in an election. *See* N.Y. Elec. Law 1-104(3); *id*. 1-104(12). In fact, the Commissioners agreed that the size of an organization is irrelevant to determining if an organization is a Party or an Independent Body. SA17.

New York's recent electoral history demonstrates that very large organizations often receive too few votes to be counted among political parties.[20] And nothing in the New York law requires Parties to reach a threshold number of contributors before they are permitted to make unlimited contributions to their own candidates. Nor does New York impose a minimum contributor requirement on its PACs. N.Y. Elec. Law §14-100(1) (defining a political committee without reference to the number of contributors); *see id*. §14-100(16) (defining a political action committee without reference to the number of contributors required).

Furthermore, as the contribution reports demonstrate, Party Housekeeping accounts would not qualify for multi-candidate PACs under federal law because they have fewer than 50 contributors. 11 C.F.R. §100.5(e)(3). For example, the most recent Housekeeping Account report for the New York Republican State Committee reveals only 31 contributors for total receipts of $335,785.93. Just one contributor

---

[20] For example, the Independence, Green, and Libertarian parties are no longer recognized as Parties under New York law, despite having 434,501, 24,972, and 20,298 active enrollees respectively. *See* SA54 at n.16; *Sam Party of N.Y. v. Kosinski*, 987 F.3d 267, 272-73 (2d Cir. 2021). They are all Independent Bodies now. *Sam Party of N.Y.*, 987 F.3d at 272.

contributed nearly 1/3 of this amount.[21] Similarly, the most recent report for the New York State Democratic Committee's Housekeeping Account revealed just 20 contributors for total receipts $449,050. 50% of these contributors were from two corporations.[22] On their most recent Housekeeping Account filing, the Working Families Party has only 14 contributors with total receipts of $481,165.67. Two contributors contributed $366,000.[23] And lastly, the Conservative Party's Headquarters Account has 39 contributors.[24] This is also consistent with prior Housekeeping Account disclosure reports where, for example, one contributor was responsible for $10,000 of the $10,541 disclosed in July 2016 for the Women's

[21] *See* NYBOE, Periodic Report of New York Republican State Committee's Housekeeping Account – 9606 (Jan. 2022), available at https://publicreporting.elections.ny.gov/CandidateCommitteeDisclosure/Candidate CommitteeDisclosure.

[22] *See* NYBOE, Periodic Report of New York State Democratic Committee (Housekeeping) – 22372 (Jan. 2022), available at https://publicreporting.elections.ny.gov/CandidateCommitteeDisclosure/Candidate CommitteeDisclosure.

[23] *See* NYBOE, Periodic Report of Working Families Party, Inc. Housekeeping – 15173 (Jan. 2022), available at https://publicreporting.elections.ny.gov/CandidateCommitteeDisclosure/Candidate CommitteeDisclosure.

[24] *See* NYBOE, Periodic Report of Conservative Party NYS (Headquarters Account) – 18199 (Jan. 2022), available at https://publicreporting.elections.ny.gov/CandidateCommitteeDisclosure/Candidate CommitteeDisclosure. Because these reports appear on the New York State Board of Elections website, this Court can take judicial notice of them. Fed. R. Evid. 901(7)(A); Fed. R. Evid. 201(b)(2), 201(d).

Equality Party Housekeeping Account. Similarly, two contributors were responsible for $1,000,000 of the $1,051,000 in receipts disclosed in January 2018 for the New York Republican State Committee. *See Upstate Jobs Party, et al. v. Kosinski*, No. 18-1586, Appellants' Op. Br. at 29 n.3 and 31 n.5 (2d Cir. June 13, 2018) (ECF 53).

Thus none of these accounts would even qualify as multi-candidate PACs under federal law.

For that reason, the idea that New York can justify capping contributions that independent bodies may receive based on their smaller size and number of contributors has no grounding in law or in fact. Furthermore, because New York law permits the very evil New York asserts it is trying to prevent—large contributions from organizations with small donor pools—with its asymmetric contribution limits, this Court cannot recognize the interest as compelling. *Cf. Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546-47 (1993) (holding that the City of Hialeah did not satisfy its burden to proving a compelling interest when it prohibited only First Amendment protected activity but did not prohibit other conduct that produced the same or substantially similar harm).

Indeed, the record below largely shows the opposite of New York's justification. The Commissioners have apparently never brought an enforcement action against any Independent Body. *See* SA17. Upstate Jobs Party follows its own internal procedures to prevent violations of New York's contribution rules. SA14-

17. Nor could Defendants identify a single instance where an Independent Body had been implicated in any campaign-finance scandal. *Cruz*, 542 F.Supp.3d at 13. Indeed, eighteen states permit unlimited contributions generally,[25] including, for example, Florida which specifically exempts both minor and major political parties from contribution limits.[26] Still New York adduced no evidence from these states demonstrating that minor parties are more likely than their larger counterparts to engage in *quid pro quo* corruption. This void, of course, "undermines the government's proffered interest." *Cruz*, 542 F. Supp.3d at 13; *McConnell*, 540 U.S. at 231-32; *see also* SA17.

The legislative history cited by the Commissioners (and relied on by the district court) is no help; none of it even mentions Independent Bodies. In fact, the legislative history is about a different statute: the Housekeeping Account disclosure provision. Op. Br. at 32 (citing ECF 57-5 at 1, 2, 18, 19). Nor does any of it pair unlimited contributions to a Party's candidate or an Independent Body's candidate to anti-corruption concerns. In fact, the legislative history is also concerned with the

---

[25] *See State Limits on Contributions to Candidates*, 2021-2022 Election Cycle, National Conference of State Legislators (Jun. 2021), *available at* https://www.ncsl.org/Portals/1/Documents/Elections/Contribution_Limits_to_Can didates_2020_2021.pdf (last visited April 18, 2022).

[26] *See* Fla. Stat. §97.021(20) (defining minor political parties as any group whose members amount to less than 5% of the total registered voters in Florida); *id.* §§106.08 (1) (exempting political parties from contribution limits and not creating separate limits for minor political parties).

illegitimate rationale of preventing contributors from buying access to a Party. *Id*. at 17. Nor does any of the legislative history pair unlimited contributions to anti-corruption concerns. Simply put, there is nothing in the legislative record to suggest that anti-corruption concerns drove the creation of asymmetrical contribution limits. That the word "corruption" appeared four times in the legislative history, and that some legislators appeared concerned with contributors buying political influence, does not carry the Commissioners' burden. *See Cruz*, 542 F. Supp. 3d at 14 (rejecting legislative history of loan-repayment limit statute because the legislature "established no clear emphasis" as to whether the loan-repayment statute targeted *quid pro quo* corruption or the impermissible purpose of leveling the playing field). New York therefore fails in its burden to prove that its statutes target actual *quid pro quo* corruption.

> 2. New York Failed to Show That its Regime Targeted Apparent *Quid Pro Quo* Corruption.

The district court was similarly mistaken when it found that the Commissioners satisfied their burden proving that the asymmetric contribution limits targeted the *appearance* of corruption. SA55. For this proposition, the court cited logic, commentary from political scientists, and stray statements from *McCutcheon*. None of that, however, constitutes the sort of evidence courts have

found sufficient to carry the government's burden when it must show that a campaign contribution limit targets the appearance of corruption.[27]

As an initial matter, the logic the Court followed doesn't add up. Just because Independent Bodies are small, support fewer candidates, and have fewer contributors, it in no way follows that their risk of corruption is greater than the large established Parties who can make unlimited contributions to their candidates. SA54; *see also* Op. Br. at 33-35. As discussed *supra* at 40-44, New York cannot claim a concern that party size or the number of contributors impacts the actual or apparent corruption analysis.

The report from the Defendants' expert does not move the needle in their direction. In his view, "large contributions" have been associated with "special access," "policy favors," and "influence by large donors." ECF 57-3 at 4; *see also id.* at 9 (citing a survey where respondents expressed concern that large contributors had more "influence" than others). But access, influence, and favoritism are not legitimate targets for the appearance of corruption stemming from contribution

---

[27] *See, e.g.*, *Shrink PAC*, 528 U.S. at 394 (holding that the statewide referendum adopting the contribution limits was evidence of a perception that contributions above the approved limits constituted actual or apparent *quid pro quo* corruption); *Ognibene*, 671 F.3d at 190 (stating that a city passed referendum approving the reforms was powerful evidence of apparent corruption). *Cruz*, 542 F. Supp. 3d at 14 (holding that the FEC's survey to demonstrate a concern over apparent *quid pro quo* was deficient because it was too general).

limits. *McCutcheon*, 572 U.S. at 191-92, 208; *Citizens United*, 558 U.S. at 359.

Because his report does not distinguish between access, influence, and favoritism on

the one hand and *quid pro quo* corruption on the other,[28] this Court should disregard

his conclusions.[29]

So too, should the Court disregard the hypothetical scenario offered by the

Defendants. As an initial matter, hypothetical conjecture of this ilk is not evidence.

*McCutcheon*, 572 U.S. at 210, 213-17. And if it were, it would not change the

calculus. Specifically, it is already illegal for a candidate's friend to establish an

independent body and then direct all contributions to the candidate. *See* N.Y. Elec.

Law §§14-120; 14-126(5-6) (prohibiting contributions in the name of another and

making it a crime to make contributions to evade the contribution limits). And the

---

[28] *See also Cruz*, 542 F. Supp.3d at 14 (rejecting academic article because it did "not distinguish between voting pattern changes as a consequence of donor influence or access and voting pattern changes as part of quid pro quo corruption"); *Green Party*, 616 F.3d at 206-07 (holding that a ban on contributions from lobbyists was unconstitutional and rejecting evidence that showed people distrusted lobbyists because of the special access they had because evidence showed that the legislature improperly targeted prevent of "influence" and "favoritism" and not *quid pro quo* corruption).

[29] Dr. Wilcox readily admitted at his deposition that he is not an expert on political parties and he does not work in the field of political parties. ECF 57-2 at 56:16-18. Still, Dr. Wilcox conceded that the number of supporters is not a necessary condition to becoming a Party and he conceded that under the definitions of Party proffered by some political scientists, Upstate Jobs Party would be considered a Party. ECF 57-2 at 59:5-9; 69:11-70:3-7, 9-17. Of course, the Commissioners conceded the fact that the number of members is immaterial to achieving Party status. SA17.

Supreme Court has rejected arguments that a law can withstand First Amendment scrutiny when it is offered in response to a hypothetical situation that is barred by less constitutionally intrusive means. *See McCutcheon*, 572 U.S. at 211-12; *McConnell*, 540 U.S. at 231-32. In any event, the hypothetical is implausible. Rather than go through the trouble of establishing an Independent Body and circulating independent nominating petitions to get the candidate on the ballot—a "particularly severe" burden for minor-party candidates, *Lerman*, 232 F.3d at 147—a contributor could simply establish an independent-expenditure committee to raise and spend unlimited funds to support his candidate.[30]

> 3.   New York's Asymmetric Contribution Limit Regime is Not Closely Drawn.

As this Court has already emphasized, *Upstate Jobs Party*, 741 F. App'x at 840, the Commissioners must demonstrate that the means it uses to prevent actual or apparent *quid pro quo* corruption is "narrowly tailored to achieve the desired objective." *McCutcheon*, 572 U.S. at 218; s*ee also id*. at 199. If a plausible, less-restrictive alternative exists, New York's must prove that the alternative will be

---

[30] *See McCutcheon*, 572 U.S. at 213-14 (stating that the Government's speculation that an individual would establish one-hundred PACs to support one candidate is not rational because the individual could instead establish an independent expenditure committee and then raise and spend unlimited funds).

ineffective. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816 (2000).[31] When assessing whether a contribution limit is closely drawn, this Court "nonetheless ask[s] whether experience under the present law confirms a serious threat of abuse." *McCutcheon*, 572 U.S. at 219 (citation omitted). And because New York permits *unlimited* contributions for Parties but imposes substantially lower limits for Independent Bodies, this Court must be particularly diligent in scrutinizing the law's fit between the Commissioners' asserted interest and the means chosen to achieve that interest. *Id*. at 221.

Under these criteria, the district court was correct to enjoin the law.

*First*, as the district court noted, there is no evidence that Independent Bodies have violated contribution limits. *See* SA17, 22, 26. This lack of record evidence is fatal to the Commissioners' argument that the threat of abuse by Independent Bodies justifies the asymmetric limits. Experience tells us otherwise. *McCutcheon*, 572 U.S. at 219; *see also id.* at 219-20 (stating that there was no evidence that recipients of contributions above the contribution limits were then transferring the contributions elsewhere, rejecting the Government's anti-circumvention fears). Furthermore, the Court rightly rejected New York's contention that because Independent Bodies are

---

[31] *See also McCutcheon*, 572 U.S. at 220-23 (holding that more closely drawn alternatives existed to achieve anti-circumvention interests than the "indiscriminate" ban of all contributions to candidates above an annual aggregate limit).

not as regulated as Parties, New York's asymmetric contribution limits are closely drawn. SA58. Simply put, New York's imposition of requirements regarding the composition of Party's leadership, filling vacancies, filing amendments of rules are not targeted at preventing the hallmark of corruption, the financial *quid pro quo*. *McCutcheon*, 572 U.S. at 192.

Indeed, Courts have declared contribution regimes unconstitutional where the disparity between contributions to major-party and minor-party candidates was only $200. *Riddle*, 742 F.3d at 928-29. This is because the interest asserted—preventing actual or apparent corruption—was not advanced absent an evidentiary showing that minor parties were more corruptible than their major counterparts. *See Riddle*, 742 F.3d at 928-29. If a mere $200 difference was not closely drawn in *Riddle*, it follows that the massive disparity drawn by New York law between *unlimited* contribution for Parties and a substantially limited contribution cap for Independent Bodies cannot be considered closely drawn.

There is also mismatch between New York's assertion that it is targeting *quid pro quo* corruption and the evidence. There is no evidence of Independent Bodies involved in actual corruption nor is there evidence that Independent Bodies are more corruptible justifying asymmetric contribution limits. *Green Party*, 616 F.3d at 206-07 (declaring unconstitutional a ban on lobbyist contributions as not closely drawn because there was no evidence of corruption from lobbyists—and rejecting evidence

that the public distrusted lobbyists because the evidence improperly targeted access, not corruption—and therefore not all contributions from lobbyists triggered apparent corruption concerns); *Riddle*, 742 F.3d at 928.

*Second*, more closely drawn means exist to address the Commissioners' concerns. For example, New York can achieve its anti-corruption interest by imposing the same disclosure requirements on Independent Bodies as it does on Parties. *See McCutcheon*, 572 U.S. at 223. Disclosure provides New Yorkers with information about who is funding Upstate Jobs Party's elections. *See Citizens United*, 558 U.S. at 367. Disclosure also deters both actual and apparent corruption "by exposing large contributions and expenditures to the light of publicity." *McCutcheon*, 572 U.S. at 223 (citation omitted). Accordingly, disclosure is a less restrictive alternative to preventing actual and apparent *quid pro quo* corruption. *See id*. The district court correctly ruled that the Commissioners failed to substantively rebut this argument, SA60, and they have similarly failed to do so here.

Next, New York's concern can be addressed by following the federal government's lead and enacting anti-proliferation statutes rather than disparate contribution limits. *See McCutcheon*, 572 U.S. at 211-12. The federal government prohibits contributors from creating or controlling multiple affiliated PACs. *Id.* at 201, 213. Establishing anti-proliferation statutes in New York would similarly prohibit individuals from establishing or controlling Independent Bodies when those

individuals are connected to Parties or connected to other Independent Bodies. *See McCutcheon*, 572 U.S. at 199, 201, 211-13. Here too, the district court ruled that the Commissioners failed to rebut this argument. SA60-61. And here too, they fail to meaningful address it on appeal.

Additionally, New York's concern can be addressed by requiring that Upstate Jobs Party segregate the contributions it receives from individuals who have contributed the maximum amount to candidates that the Upstate Jobs Party are supporting. New York can then limit those funds to, e.g., Get-Out-the-Vote efforts, signature gathering, and other activities where the money is not flowing directly to the candidate. *See McCutcheon*, 572 U.S. at 222. Here too, the district court ruled that the Commissioners failed to rebut this argument. SA60-61. And here, too, the Commissioners have failed to rebut it on appeal. Even assuming New York satisfied its burden of proving it had a compelling interest here, it uses means that are neither narrowly tailored.

## C. New York's Counterarguments are Meritless.

In their opening brief, the Commissioners lob a variety of counterarguments. None have merit. Most are strawmen.

For instance, the Plaintiffs have not argued that the Constitution prohibits creating different contribution limits for Parties, Individuals, and PACs. *See* Op. Br. at 38. Instead, Plaintiffs contend that it is unconstitutional for the Commissioners to

enforce asymmetrical contribution limits for parties competing in the same election. *See Davis*, 554 U.S. at 744. For that reason, a decision in favor of the Plaintiffs is no threat to other New York laws that allow Political Parties to raise more funds than non-Political Parties. *See* Op. Br. at 38-39.

Contrary to the Commissioners' assertion, Op. Br. at 28-30, 40, this Court does not owe the legislature deference because Plaintiffs do not claim that New York's contribution limits are too low. *See Davis*, 554 U.S. at 737.[32] Instead, especially here where the contribution limits are asymmetrical, this Court should protect First Amendment rights. *See Citizens United*, 558 U.S. at 361; *Ognibene*, 671 F.3d at 182; *Cruz*, 542 F. Supp. 3d at 19. In other words, the district court did not substitute its judgment for that of the State legislature regarding the proper contribution limit. Op. Br. at 41. Instead, the district court held, correctly, that the Commissioners failed to satisfy their burden to prove New York's asymmetric contribution limits were closely drawn to satisfy a sufficiently important interest. *Davis*, 554 U.S. at 740-44; *Riddle*, 742 F.3d at 925 n.2; SA60-61.

Additionally, the district court was right to decline to apply the *Anderson/Burdick* standard. Op. Br. at 30 (citing *Clingman v. Beaver*, 544 U.S. 581, 592 (2005)). The *Anderson/Burdick* standard is "flexible" because it recognizes that,

---

[32] Further, the ability to raise sufficient funds is not an independent basis for upholding a contribution limit. *See Cruz*, 542 F. Supp.3d at 18.

for orderly and honest elections, states are constitutionally obligated to enact complex election codes. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). In other words, states must exert broad control over their election processes. U.S. CONST. art. I, §4; *Clingman*

, 544 U.S. at 586, 594; *Burdick*, 504 U.S. at 433. Courts therefore apply this flexible standard when analyzing the right calibration between a State's constitutional obligation to regulate elections and an individual's constitutional right to cast a ballot.[33]

Conversely, States have "no constitutional obligation to limit contributions at all." *Davis*, 554 U.S. at 737; *see, e.g.*, Va. Code §§24.2-945, et seq. (unlimited contributions). So when states choose to limit contributions, courts must apply a rigorous standard because the First Amendment's impact drives the analysis entirely in the direction of the individual. *See McCutcheon*, 572 U.S. at 199. New York's insistence that the flexible standard developed in the *Anderson/Burdick* line of cases applies to Plaintiffs' challenge here reveals that New York uses their contribution limits to structure electoral debates, which the First Amendment prohibits. *See*

---

[33] *See, e.g.*, *Burdick*, 504 U.S. at 430-33 (analyzing Hawaii's statute prohibiting write-in candidates in primary elections); *Clingman*, 544 U.S. at 586 (analyzing Oklahoma's semi-closed primary system permitting registered party voters and independents to participate in primary elections), *Sam Party*, 987 F.3d at 271-72, 274 (analyzing New York's process of becoming a Party and achieving automatic ballot access under *Anderson/Burdick*).

*McCutcheon*, 572 U.S. at 203. The authority to structure electoral *discussion* is instead placed in the hands of the people.

*   *   *

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *McCutcheon*, 572 U.S. at 210. The Commissioners failed to satisfy this burden. For these reasons, the Court should affirm the district court's grant of summary judgment for the Plaintiffs on their First Amendment claim.

### D. New York's Unequal Contribution Limit Imposed on Mr. Babinec Violates The First And Fourteenth Amendments.

The First Amendment does not allow for "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United*, 558 U.S. at 340. "Speech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.* Such is the case with New York's unequal contribution limits as-applied to Martin Babinec.

By restricting Mr. Babinec's speech based on the identity of the party with whom he chooses to associate, New York "commit[s] a constitutional wrong" by "identif[ying] certain preferred speakers." *Id.* Ultimately, the point of the First Amendment is to remove governmental restraints from the arena of public discussion. *McCutcheon*, 572 U.S. at 203. Of course, the First Amendment protects Mr. Babinec's ability to speak with equal weight through whichever party he

chooses; New York may not "deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Citizens United*, 558 U.S. at 341. Thus, contrary to the Commissioners assertion, Op. Br. at 43, Mr. Babinec's complaint is not that the contribution limit is too low, or too high, but that it is *unequal*. Because the law creates a class of favored contributors who contribute to Parties and disfavored contributors who contribute to Independent Bodies, it also violates the Equal Protection Clause. *Riddle*, 742 F.3d at 926, 929-30. Mr. Babinec and all other contributors are not less corruptible when they contribute to Parties and suddenly more corruptible when they contribute to Independent Bodies. Because Parties and Independent Bodies are both campaigning for votes, Mr. Babinec is similarly situated to contributors to Parties who are wanting to advance the cause of their political party of choice.

      1.    The District Court Wrongly Decided That the Unequal Contribution Limit was Targeted at Actual and Apparent *Quid pro Quo* Corruption.

New York has already determined that individuals may contribute up to $117,300 to Parties without triggering any anti-corruption interest. N.Y. Elec. Law §14-114(10); 9 N.Y.C.R.R. §6214.0. But if that same individual wishes to contribute to Upstate Jobs Party instead of a Party, New York imposes a substantially lower limit, $47,100, if Upstate Jobs Party is running a gubernatorial candidate. *Id.* § 14-114(1); 9 N.Y.C.R.R. §6214.0. The same contributor is similarly situated when he

contributes to a Party and to Upstate Jobs Party. *Riddle*, 742 F.3d at 927. The only difference is the contributor's political preference. *Id*. The contributor's political preference does not implicate the interest in preventing *quid pro quo* corruption.

To sustain this substantial disparity between what Upstate Jobs Party supporters can contribute to Upstate Jobs Party and what New York Democratic State Party supporters can contribute to the Democratic Party, New York must show that Upstate Jobs Party or Independent Bodies are more corruptible than the Parties. *See Riddle*, 742 F.3d at 928. This is especially true since Mr. Babinec's $117,300 contribution to a Party is not treated as corrupting, but his contribution in the same amount to Upstate Jobs Party is. *See McCutcheon*, 572 U.S. at 210 (questioning how contributions within the base limits are not corrupting but once the aggregate limit is reached, those same contributions within the base limits become corrupting). Furthermore, the Supreme Court has already ruled that "imposing different contribution and coordinated party expenditure limits on candidates vying for the same seat is antithetical to the First Amendment." *Davis*, 554 U.S. at 744. It cannot be true that imposing different contribution limits against different parties competing for the same votes is permissible under the First Amendment. *See Riddle*, 742 F.3d at 932 (Gorsuch, J., concurring) (citing *Davis*, 554 U.S. at 743-44); *Russell*, 146 F.3d at 572 (declaring unconstitutional a statute that permitted some PACs to contribute more than 2.5 times the amount other PACs could contribute).

The Commissioners failed to adduce evidence that Independent Bodies have been implicated in campaign finance scandals. SA17; When legislative bodies create statutes with separate and lower contribution limits for government contractors, the record was robust. *Green Party*, 616 F.3d at 193-94; *Ognibene*, 671 F.3d at 189-91. And for the same reasons that the Commissioners did not prove actual or apparent corruption for the unequal contribution limits for Parties and Independent Bodies to their candidates, the same arguments apply here. *See supra* at 36-48. New York failed to prove that its statute targeted *quid pro quo* corruption. The legislative history discussed *disclosure* of contributions to Housekeeping Accounts. *See supra* at 44-45. The legislative history did not discuss contributions from individuals to Independent Bodies. This Court should reject the evidence. *Cruz*, 542 F. Supp.3d at 14.

> 2. The District Court Correctly Held That the Unequal Contribution Limits for Mr. Babinec are not Closely Drawn.

Importantly, the Commissioners did not supply this Court with evidence to permit the Court to "assess the fit between the stated governmental objective and the means selected to achieve that objective." *McCutcheon*, 572 U.S. at 199. Assessing this fit ensures reviews whether New York's two-tiered contribution limits regime "avoid[s] unnecessary abridgment of First Amendment rights." *Id*. (citation omitted).

The Commissioners did not adduce evidence that individuals used Independent Bodies to make contributions to candidates where the contributor had already exceeded the limits. SA17. Experience therefore shows that this is not an avenue for abuse. *McCutcheon*, 572 U.S. at 219. Because New York did not supply this Court with evidence Independent Bodies are uniquely more susceptible to corruption than Parties, New York's unequal treatment of Mr. Babinec's contributions is not closely drawn. *See, e.g.*, *Riddle*, 742 F.3d at 928-29.

As stated *supra* at 48-52, New York could implement more closely drawn means to protect their asserted interest. For example, New York could enhance its disclosure requirements and enact anti-proliferation statutes, and statutes that redirect funds away from candidates. *See McCutcheon*, 572 U.S. at 210-11.

Without a case citation, the Commissioners advance their tired argument that Independent Bodies' small size, small pool of contributors, and lack of organizational structure justify the disparity in contribution limits. Op. Br. at 42. And without a record citation, the Commissioners further assert that a $100,000 contribution could "purchase" an entire campaign. *Id*. at 42-43.

That an Independent Body is small is irrelevant as a matter law. *See supra* at 40-44. Nor can the Commissioners claim that because some speakers have additional state-imposed obligations, New York is therefore empowered to provide those preferred speakers more speech. *See infra* at 71-72. None of the state-imposed

administrative statutes involve measures to control funds or prevent actual or apparent *quid pro quo* corruption. These statutes are about bedrock internal operating procedures of a Party. *See supra* at 7. These are not campaign finance statutes enacted to prevent actual or apparent financial *quid pro quo* corruption, the hallmark of corruption. *McCutcheon*, 572 U.S. at 192. Furthermore, it cannot be that the state can justify asymmetric contribution limits based "on a problem of its own creation." *Riddle*, 742 F.3d at 932 (Gorsuch, J., concurring); *see infra* at 71-72. That New York imposes additional "costs" on Parties does not make New York's asymmetric limits narrowly tailored. SA58; *Riddle*, 742 F.3d at 928-29 (ruling that granting higher contribution limits for parties because of costs is separate from acting to prevent corruption). Accordingly, New York's asymmetric contribution limits are not narrowly tailored.

In conclusion, this Court should affirm the district court's declaration that New York's asymmetric contribution limits imposed on Independent Bodies are unconstitutional.

## ARGUMENT ON CROSS-APPEAL

Although the district court rightly concluded that New York's disparate contribution limits violate both the First and Fourteenth Amendments, it erred by finding that allowing Parties, but not Independent Bodies, to establish housekeeping accounts complies with the U.S. Constitution. This error warrants reversal of that portion of the district-court's summary judgment order.

Housekeeping accounts are separate, segregated bank accounts that a Party may use to raise unlimited funds. N.Y. Elec. Law §14-124(3). Once raised, however, New York law limits how the funds may be used. *See id*. Specifically, Parties may use contributions raised for this account to pay for headquarters, office staff, and other "ordinary activities which are not for the express purpose of promoting the candidacy of specific candidates." *Id*. Parties are not, for instance, permitted to use funds from this account to pay for expenses that are allocable to candidates. NYSBOE Dep. Tr. at 119:3-8 (Dkt. No. 56-3 at 426).

New York prohibits Independent Bodies from establishing Housekeeping Accounts at all. This ban violates both the First and Fourteenth Amendments because it is not targeted at actual or apparent *quid pro quo* corruption. The Commissioners lack both a compelling and sufficiently important interest to *ban* Upstate Jobs Party from establishing a Housekeeping Account. Furthermore, the ban constitutes neither narrowly tailored.

## I. NEW YORK'S BAN ON HOUSEKEEPING ACCOUNTS FOR INDEPENDENT BODIES VIOLATES THE FIRST AND FOURTEENTH AMENDMENTS.

In choosing to regulate campaign finances, New York may impose limits and bans that target only *quid pro quo* corruption or its appearance. *Quid pro quo* corruption refers to the "direct exchange of an official act for money." *McCutcheon*, 572 U.S. at 192. Accordingly, to achieve its interest in preventing actual or apparent *quid pro quo* corruption, New York may use only those means that are narrowly tailored. *Id*. at 218.

Similarly, the U.S. Supreme Court has ruled that "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 101 (1972). Strict scrutiny is appropriate here.

The Housekeeping Account prohibition discriminates based on the speaker's identity: Parties can establish Housekeeping Accounts, and Independent Bodies cannot. *Compare* N.Y. Elec. Law §14-124(3) (permitting Parties only to establish Housekeeping Accounts) *with Citizens United*, 558 U.S. at 350 (ruling that the federal corporate ban on independent expenditures violated the core principle of the First Amendment prohibiting rules that discriminated based on the speaker's identity). By permitting one group of speakers to raise and spend unlimited funds for certain activities, and prohibiting another group of speakers from raising and

spending even $1 for Housekeeping Account purposes, New York is selectively infringing the free speech rights of Independent Bodies and their supporters. *See Riddle*, 742 F.3d at 927-28; *id.* at 931-32 (Gorsuch, J., concurring) (stating that the "strictest degree of scrutiny is warranted . . . when the government *selectively* infringes on a fundamental rights."). Again Parties and Independent Bodies are similarly situated. *See supra* at 31-33.

Here, the Commissioners fail to sustain their burden of establishing that the Housekeeping Account ban imposed on Independent Bodies targets preventing actual or apparent *quid pro quo* corruption. The Commissioners also fail to sustain their burden that the Housekeeping Account ban is narrowly tailored to achieve their anti-corruption goal.

> ### A. The Housekeeping-Account Prohibition does not Target Actual or Apparent *Quid pro quo* Corruption.

As noted above, "[s]pending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such *quid pro quo* corruption." *McCutcheon*, 572 U.S. at 208. Thus, when money flows through a Party to a candidate, corruption risk is low. *Id.* at 210-11. This is because once money is in the hands of the Party, the Party has control of the funds and can decide how to spend them. *Id.* For Housekeeping Account funds, expenditures are even further regulated. As the Commissioners conceded in their briefs below, New York bars money

flowing from Housekeeping Accounts to a candidate. Defs.' Mot. for Summ. J. at 19 (ECF 57-8).

This concession immediately makes the Housekeeping Account prohibition against Upstate Jobs Party nearly impossible to justify.[34] When no money flows to a candidate (the *quid*), there can be no actual or apparent corrupt act (the *quo*) that a candidate could perform in exchange for the money. *McCutcheon*, 572 U.S. at 192 ("That Latin phrase captures the notion of a direct exchange of an official act for money.") (internal citations omitted).[35]

Here, Housekeeping Accounts are even further removed than Independent Expenditure committees because independent expenditures are made to promote the candidacy of a specific candidate. This use of funds is explicitly prohibited under the Housekeeping Account statute. *See* N.Y. Elec. Law §14-124(3). Accordingly,

---

[34] *See McCutcheon*, 572 U.S. at 192, 210; *Cal. Medical Ass'n v. FEC*, 453 U.S. 182, 203 (1981) (Blackmun, J., concurring) (Stating that political committees that make contributions to candidates are materially different from committees that make independent expenditures—*i.e.*, committees where no money is flowing to a candidate—in that the latter pose no threat to corruption or the appearance thereof.); *N.Y. Progress & Prot. PAC*, 733 F.3d at 487 (Stating that there is no anti-corruption interest in limiting contributions to an organization that makes only independent expenditures.).

[35] *See also SpeechNow.org v. FEC*, 599 F.3d 686, 694-95 (D.C. Cir. 2010) (*en banc*) ("[G]roups that make only independent expenditures also cannot corrupt or create the appearance of corruption. The Court has effectively held that there is no corrupting quid for which a candidate might in exchange offer a corrupt quo.") (internal quotation marks omitted)

because no money is flowing to candidates (or even being used to promote candidates), the interest of preventing actual or apparent corruption cannot justify disparate treatment. *See McCutcheon*, 572 U.S. at 192, 210 (anti-corruption interest is focused on preventing large campaign contributions to candidates).

**B.    The Commissioners Adduced no Evidence That Independent Bodies Pose a Risk of Actual Corruption if They are Allowed to Establish Housekeeping Accounts.**

Because New York determined that *unlimited* contributions to Housekeeping Accounts are not actually or apparently corrupting, it cannot selectively apply its conclusion without adducing evidence to justify the disparate treatment. *Davis*, 554 U.S. at 741 (ruling that Congress cannot raise contribution limits for some candidates—therefore determining that raising limits does not implicate anti-corruption concerns—but then refuse to raise limits for others).[36] It has not done so here.

Perhaps because a contribution ban is a drastic measure that "utterly eliminates an individual's right" to support the political party of his or her choice, *Green Party of Conn.*, 616 F.3d at 206, when Congress has banned certain entities from contributing funds—corporations and federal contractors—it has done so with ample evidence of actual or apparent corruption. *See Wagner*, 793 F.3d at 10-14;

---

[36] *See also Green Party of Conn*, 616 F.3d at 206-07 (upholding ban on government contractor contributions because of sufficient evidence but declaring unconstitutional contribution ban for lobbyists because of insufficient evidence).

*Beaumont*, 539 U.S. at 152-55; *see also Ognibene*, 671 F.3d at 187-191. And unlike government contractors and corporations, there is no evidence of actual *quid pro quo* corruption involving Independent Bodies. SA58. Accordingly, New York cannot assert that banning Independent Bodies from establishing Housekeeping Accounts is targeted at preventing actual *quid pro quo* corruption. *See McConnell*, 540 U.S. at 231-32.

The legislative history that the Commissioners adduced is silent on permitting Independent Bodies to establish Housekeeping Accounts. Instead, the legislative history recognizes the potential actual and apparent corruption concern of unlimited contributions to Parties. ECF 57-5 at 1, 2, 18, 19. Unlike the federal government that ended the practice of unregulated contributions to political parties, *McConnell*, 540 U.S. at 141, New York chose not to impose limits on contributions to Housekeeping Accounts. Rather, New York chose only to compel disclosure of Housekeeping Account contributions. Thus the legislative history does not establish a sufficiently clear emphasis that New York was targeting actual or apparent *quid pro quo* corruption in prohibiting Independent Bodies from establishing a Housekeeping Account. *See Cruz*, 542 F. Supp.3d at 14.

**C.    New York Adduced no Evidence That Independent Bodies Pose a Risk of Apparent Corruption if They are Allowed to Establish Housekeeping Accounts.**

Because the Commissioners agreed that there is no evidence that either Independent Bodies generally are corrupt or Upstate Jobs Party specifically is corrupt, there is insufficient evidence here to infer that *all* contributions made to an Independent Body's Housekeeping Account would constitute apparent corruption. *Green Party*, 616 F.3d. at 206-07; SA58; *Riddle*, 742 F.3d at 928. There is simply nothing for this Court to review to determine that banning Independent Bodies from establishing Housekeeping Accounts constitutes closely drawn means to further a purported interest in preventing apparent *quid pro quo* corruption. *McCutcheon*, 572 U.S. at 199; *Green Party of Conn.*, 616 F.3d at 201-02, 206-07; *Cruz*, 542 F.3d at 15.

**D.    Flatly Banning Independent Bodies From Establishing Housekeeping Accounts is not Narrowly Tailored.**

Even if New York had a valid anti-corruption justification for limiting Independent Bodies' use of Housekeeping Accounts, New York could have addressed them through means short of a complete ban. A ban "is a drastic measure" that "cuts off even the symbolic expression of support evidenced by a small contribution." *Green Party*, 616 F.3d at 206 (quotation omitted).

In *Green Party*, the Court began its analysis by finding that the evidence of recent corruption scandals "had nothing to do with lobbyists . . . and thus there is

insufficient evidence to infer that *all* contributions made by state lobbyists give rise to an appearance of corruption." 616 F.3d at 206. This Court rejected evidence that "members of the public generally distrust lobbyists and the 'special attention' they are believed to receive from elected officials" because the evidence was improperly targeted at "[f]avoritism and influence" rather than *quid pro quo* corruption. *Id*. at 206-07. Accordingly, the evidence was insufficient to "demonstrate that all lobbyist contributions give rise to an appearance of corruption[.]" *Id*. at 207. Therefore, "a *limit* on lobbyist contributions would adequately address the state's interest in combating corruption," but a blanket ban did not. *See id*.

Similarly, here, there is no evidence of corruption committed by Independent Bodies. SA58. Because of this lack of evidence, there is insufficient evidence that *every* contribution to an Independent Body's Housekeeping Account "give[s] rise to an appearance of corruption." *Green Party*, 616 F.3d at 206. Accordingly, at the very least, if properly supported by evidence, regulating contributions to Independent Bodies Housekeeping Accounts would suffice.

For example, New York could impose on Independent Bodies the same disclosure requirements as Parties, which would allow New Yorkers to evaluate Upstate Jobs Party's message. *See McCutcheon*, 572 U.S. at 222-23; *see also Citizens United*, 558 U.S. at 367. Alternatively, to assuage any concern about the proliferation of Independent Bodies, rather than *ban* Independent Bodies from

establishing Housekeeping Accounts, New York could, like the federal government, establish anti-proliferation statutes.

Another way New York could achieve its stated goals would be through a Housekeeping Account contribution limit, instead of a complete ban. As this Court previously ruled, "if the state's interests in this case can be achieved by means of a *limit* on lobbyist contributions, rather than a ban, the ban should be struck down for failing to avoid unnecessary abridgment of associational freedoms." *Green Party*, 616 F.3d at 206-207 (citation omitted). In summary, New York can achieve its goals without unnecessarily abridging Upstate Jobs Party's First Amendment rights.

## II.    THE DISTRICT COURT'S DENIAL OF PLAINTIFFS' HOUSEKEEPING ACCOUNT SUMMARY-JUDGMENT ARGUMENT WAS WRONG AS A MATTER OF LAW.

The district court held that the Housekeeping Account ban was targeted at preventing actual and apparent *quid pro quo* corruption for the same reasons that New York's challenged contribution limits are targeted at *quid pro quo* corruption. SA66-68. Plaintiffs disagree and refer this Court to the reasons why the Housekeeping Account is not targeted at actual or apparent *quid pro quo* corruption. *See supra* at 63-67; *id*. 36-48.

As for its closely drawn analysis, the district court's reasoning is bizarre. The district court held that because New York does not impose contribution limits on Housekeeping Accounts—thereby agreeing that there is no risk of corruption—the

danger of *quid pro quo* corruption is "significant." SA67. The district court supported this holding by relying on Dr. Wilcox's report, concluding that "the larger the contribution, the greater the threat of corruption." *Id*.

But because no Housekeeping Account funds are flowing to candidates—either through contributions or independent expenditures—there can be no threat of actual or apparent corruption. *See, e.g.*, *McCutcheon*, 572 U.S. at 192, 210; *N.Y. Progress & Prot. PAC*, 733 F.3d at 487; *SpeechNow.org*, 599 F.3d at 694-95. There is simply no *quid* given in exchange for a *quo*. And unlike the federal government, which banned soft money contributions to Parties because of evidence that Parties gave elected officials perks and used these funds to help candidates' election chance, *McConnell*, 540 U.S. at 131, 146, New York has declined to prohibit Housekeeping Accounts altogether or prohibit Parties from using Housekeeping Account funds for "lavish perks, bonuses, or even expenditures that indirectly promote the candidacy of specific candidates." SA67-68. Thus, New York cannot claim an anti-corruption interest out of a concern that Independent Bodies will use Housekeeping Account funds in ways that the statute does not prohibit.

Furthermore, and contrary to Dr. Wilcox's assertion, the risk of actual or apparent corruption does not come from large contributions in a vacuum. SA67. Rather, the Supreme Court has been clear that actual or apparent corruption arises from large contributions to *candidates*. *McCutcheon*, 572 U.S. at 225 ("[T]he risk of

corruption arises when an individual makes large contributions to the candidate or officeholder himself."). There is no actual or apparent *quid pro quo* corruption when money is not flowing to a candidate, no matter how large the contribution. *N.Y. Progress & Prot. PAC*, 733 F.3d at 487.

As for Mr. Quail's concern that permitting Independent Bodies to have a Housekeeping Account will cause them to proliferate overnight, SA67, experience does not bear out this concern. *McCutcheon*, 572 U.S. at 219. Because there is no evidence of campaign finance scandals associated with Independent Bodies, SA17, experience suggests that candidates are not going to use Independent Bodies to circumvent contribution limits. Furthermore, New York can address Mr. Quail's concerns with more closely drawn means such as anti-proliferation statutes. *See McCutcheon*, 572 U.S. at 211-13; *see supra* at 48-52.

Next, the district court gets caught in its own circular web. It asserts that Independent Bodies cannot have Housekeeping Accounts because Independent Bodies are not as regulated as parties. SA67-68. But if the administrative statutes that New York imposes on Parties do prevent corruption, then they are necessarily the more closely drawn means of preventing actual or apparent corruption—not imposing asymmetric contribution limits.

Further, New York cannot justify its unequal treatment of Independent Bodies because New York's chosen statutory regime gives more obligations to Parties than

to Independent Bodies. *See Riddle*, 742 F.3d at 932 (Gorsuch, J., concurring). Having additional "costs" is not the same interest as preventing *quid pro quo* corruption. *Id*. at 928-29. New York cannot rely on additional costs or obligations to save its asymmetrical contribution limits and bans. Moreover, The Supreme Court prohibits states from granting the benefits of incorporation in exchange for a corporation's free speech rights. *Citizens United*, 558 U.S. at 351. Similarly, New York cannot use the benefits of additional speech for some in exchange for imposing administrative obligations.

Additionally, the district court holds that the Housekeeping Account ban is closely drawn because Independent Bodies, like Upstate Jobs Party, are small and have very few contributors. SA68. But, for the same reasons advanced above, *supra* at 40-44, this Court should reject this argument too. New York does not have a statute requiring a minimum number of contributors. Nor does New York have a statute requiring a minimum number of supporters before achieving Party status. New York cannot use this rationale to selectively infringe the free speech and equal protection rights of Independent Bodies.

Finally, because there is no evidence of actual corruption involving Independent Bodies, SA17, there is simply insufficient evidence to infer that any and all contributions to an Independent Body housekeeping account leads to

apparent corruption. *See Green Party*, 616 F.3d at 206. Here, a ban is simply not narrowly tailored. *See id.*

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's grant of summary judgment for the Defendants on the Plaintiffs' Housekeeping-Account claim. This Court should affirm the district court's grant of summary judgment on Plaintiffs' contribution limit claims.

Respectfully submitted,

DATED: April 19, 2022

*/s/ Shawn Toomey Sheehy*
Shawn Toomey Sheehy
Edward Wenger
Phillip Michael Gordon
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: 540-341-8808
Fax: 540-341-8809
ssheehy@holtzmanvogel.com
ewenger@holtzmanvogel.com
pgordon@holtzmanvogel.com

*/s/ Michael Burger*
Michael Burger
SANTIAGO BURGER LLP
*Attorneys for Plaintiffs*
2280 East Avenue
Rochester, NY 14610
O: (585) 563-2400
F: (585) 563-7526
M: (585) 478-6576
mike@litgrp.com

*Counsel to Plaintiffs-Appellees/Cross-Appellants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Local Rule 28.1.1, I certify the following: This brief complies with the type-volume limitations because it contains 16,438 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) and Local Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word 2021 in Times New Roman 14-point font.

*/s/ Shawn Toomey Sheehy*
Shawn Toomey Sheehy
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: 540-341-8808
Fax: 540-341-8809
ssheehy@holtzmanvogel.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed with the Clerk via the CM/ECF system that has sent a Notice of Electronic filing to all counsel of record.

/s/ Shawn Toomey Sheehy
Shawn Toomey Sheehy
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: 540-341-8808
Fax: 540-341-8809
ssheehy@holtzmanvogel.com

# ADDENDUM

*NY CLS Elec § 14-124*

Current through 2022 released Chapters 1-49, 61-174

*New York Consolidated Laws Service  >  Election Law (Arts. 1 — 17)  >  Article 14 Campaign Receipts and Expenditures; Public Financing [Effective November 9, 2022] (Titles I — II)  >  Title I Campaign Receipts and Expenditures [Effective November 9, 2022] (§§ 14-100 — 14-132)*

## § 14-124. Exceptions

**1.** This article shall not apply to any person, association or corporation engaged in the publication or distribution of any newspaper or other publication issued at regular intervals in respect to the ordinary conduct of such business.

**2.** The filing requirements and the expenditure, contribution and receipt limits of this article shall not apply to any candidate or committee who or which engages exclusively in activities on account of which, pursuant to the laws of the United States, there is required to be filed a statement or report of the campaign receipts, expenditures and liabilities of such candidate or committee with an office or officers of the government of the United States, provided a copy of each such statement or report is filed in the office of the state board of elections.

**2-a.** The provisions of sections 14-102, 14-112 and subdivision one of *section 14-118* of this article shall not apply to a political committee supporting or opposing candidates for state or local office which, pursuant to the laws of the United States, is required to file a statement or report of the campaign receipts, expenditures and liabilities of such committee with an office or officer of the government of the United States, provided that such committee makes no expenditures to aid or take part in the election or defeat of a candidate for state or local office other than in the form of contributions which do not exceed in the aggregate one thousand dollars in any calendar year, and provided further, that a copy of the federal report which lists such contributions is filed with the appropriate board of elections at the same time that it is filed with the federal filing office or officer.

**3.** The contribution and receipt limits of this article shall not apply to monies received and expenditures made by a party committee or constituted committee to maintain a permanent headquarters and staff and carry on ordinary activities which are not for the express purpose of promoting the candidacy of specific candidates; provided that such monies described in this subdivision shall be deposited in a segregated account.

**4.** No candidate and no political committee taking part solely in his campaign and authorized to do so by him in accordance with this article and no committee involved solely in promoting the success or defeat of a ballot proposal shall be required to file a statement required by sections 14-102 and 14-104 of this article if at the close of the reporting period for which such statement would be required neither the aggregate receipts nor the aggregate expenditures by and on behalf of such candidate or to promote the success or defeat of such proposal, by such candidate or such political

committee or committees exceed one thousand dollars and such candidate or such committee files, on the filing date otherwise provided, a statement, sworn or subscribed and bearing a form notice that false statements made therein are punishable as a class A misdemeanor pursuant to *section 210.45 of the penal law*, stating that each of such aggregate receipts and aggregate expenditures does not exceed one thousand dollars.

**5.** The provisions of sections 14-104 and 14-112, and subdivision a [1]* of section 14-118 shall not apply to any candidate for member of a county committee of a political party or any candidate for delegate or alternate delegate to a judicial district convention if the campaign expenditures made by or on behalf of such candidate do not exceed fifty dollars.

**6.** The provisions of sections 14-102, 14-104 and 14-118 respectively, of this article shall not apply to a candidate or a committee taking part solely in his campaign and authorized to do so by him in accordance with the provisions of this article in a campaign for election to public office or to a committee involved solely in promoting the success or defeat of a ballot proposal in a city, town or village having a population of less than ten thousand, as shown by the latest federal or state census or enumeration, unless the aggregate receipts of said candidate and his authorized committees or the committees promoting the success or defeat of a proposal or the aggregate expenditures made by such candidate and his authorized committees or the committees promoting the success or defeat of a proposal exceed one thousand dollars.

**7.** No candidate who is unopposed in a primary election and no political committee authorized by him pursuant to the provisions of this article and taking part solely in his campaign shall be required to file the two statements of receipts, expenditures and contributions required by this article to be filed immediately prior to such uncontested primary election, provided that all the information which would be required to be filed in such statements for a candidate for election to public office shall be contained in the first statement required to be filed in connection with the ensuing general election.

**8.** A political committee formed solely to promote the success or defeat of any ballot proposal submitted to vote at a public election is exempt from filing statements required by this article until that committee has received or expended an amount in excess of one hundred dollars.

## History

Add, L 1976, ch 233, eff Dec 1, 1977; amd, L 1977, ch 323, §§ 4, 5, eff Dec 1, 1977; L 1977, ch 343, §§ 4, 5, eff Dec 1, 1977; L 1978, ch 8, § 47, eff March 7, 1977; L 1978, ch 9, § 105, eff March 7, 1978; L 1982, ch 63, § 1, eff April 12, 1982; L 1982, ch 647, § 26, eff Jan 1, 1983; L 1983, ch 70, § 4, eff May 3, 1983; L 1983, ch 955, § 3, eff Oct 7, 1983; L 1984, ch 454, § 1, eff July 20, 1984; L 1988, ch 71, § 1, eff May 9, 1988; *L 2016, ch 286, § 1* (Part B), effective August 24, 2016.

---

* Bracketed language inserted by the Publisher.

New York Consolidated Laws Service
Copyright © 2022  Matthew Bender, Inc.,
a member of the LexisNexis (TM) Group All rights reserved.

**End of Document**

Current through the ratification of the 27th Amendment on May 7, 1992.

*United States Code Service* > *Amendments* > *Amendment 1 Religious and political freedom.*

## Amendment 1 Religious and political freedom.

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

United States Code Service
Copyright © 2022 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM) All rights reserved.

**End of Document**

## *USCS Const. Amend. 14, Part 1 of 15*

Current through the ratification of the 27th Amendment on May 7, 1992.

*United States Code Service* > *Amendments* > *Amendment 14*

# Amendment 14

**Sec. 1. [Citizens of the United States.]** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Sec. 2. [Representatives—Power to reduce apportionment.]** Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice-President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

**Sec. 3. [Disqualification to hold office.]** No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

**Sec. 4. [Public debt not to be questioned—Debts of the Confederacy and claims not to be paid.]** The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Sec. 5. [Power to enforce amendment.]** The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

Page 2 of 2

USCS Const. Amend. 14, Part 1 of 15

United States Code Service
Copyright © 2022 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM) All rights reserved.

**End of Document**